666 F.2d 1104
 DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, Petitioner,
v.
FORSYTH ENERGY, INC., Old Republic Companies, Alex C.
McCluskie, Forsyth-Carterville Coal Company, and
Ray Legan, Respondents.
 Nos. 81-1325, 81-1505.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 16, 1981.
Decided Dec. 11, 1981.
 
 Joseph T. Bednarik, Sol. of Labor, U.S. Dept. of Labor, Washington, D.C., for petitioner.
 Mark E. Solomons, Kilcullen & Kilcullen, Ctd., Washington, D.C., for respondents.
 Before SWYGERT, Senior Circuit Judge, SPRECHER, Circuit Judge, and CRABB, District Judge.*
 SWYGERT, Senior Circuit Judge.
 
 
 1
 The two claims consolidated for this appeal involve the interpretation of Section 435(a)(2)(A) under Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §§ 901 et seq.[1] (hereinafter "the Act").
 
 
 2
 Before resolving the issues presented by this appeal, we find it necessary to discuss the history of the Act. Congress enacted Title IV of the Act[2] to provide benefits for coal miners totally disabled by pneumoconiosis and the eligible survivors of miners who died due to the disease. The financial responsibility for the compensation of miners was divided into two parts. Under Part B of the 1969 Act, all claims for benefits filed before January 1, 1973 were to be adjudicated by the Secretary of Health, Education and Welfare. If approved, these claims were to be paid from general federal revenues. Under Part C, claims on or after January 1, 1973 were to be filed under an approved state workers' compensation law. In the absence of an approved state plan, claims were filed with and processed by the United States Department of Labor. Part C claims were to be paid by a responsible coal mine operator if one could be identified. A coal mine operator was required to secure the payment of benefits for which it might be found liable by purchasing an approved policy of insurance or by qualifying as a self insurer with the Department of Labor. If no operator was found to be responsible or if an operator failed to pay benefits for any number of reasons, the claim was to be paid from general federal revenues.[3]
 
 
 3
 In 1972, the Act was amended to alter the filing periods and extend the program termination date.[4] The Part B filing period was enlarged to encompass all claims filed prior to July 1, 1973. Part C now included all claims filed after December 31, 1973. Those claims filed between July 1 and December 31, 1973 were covered by section 415, which provided that the United States had responsibility for these claims until December 31, 1973. Thereafter, responsible operators could be found liable for benefits as if the claim had been filed pursuant to Part C.[5]
 
 
 4
 Subsequent to January 1, 1974, when Part C went into effect, it became clear that Congress's original intention to transfer all liability for Part C claims to the coal industry was not being realized.[6] In order to finally and completely ensure that coal mine operators bear the fiscal responsibility for payment of Black Lung Benefits, the Act was amended by the Black Lung Benefits Reform Act of 1977[7] and the Black Lung Benefits Revenue Act of 1977.[8] The Revenue Act established the Black Lung Disability Trust Fund, the corpus of which is supported principally through an excise tax levied on the sale of coal. The fund is to be used to pay benefits to claimants where there is no coal operator required to pay or where an operator is in default.[9] The principal feature of the Reform Act was the establishment of more lenient standards of eligibility and a mechanism providing for the review under the new standards of all claims pending or denied under the old standards.
 
 
 5
 According to section 15 of the Reform Act (section 435 of the Act), all pending or denied Part B claimants are required to make an election under section 435(a) and their claims follow one of three courses:
 
 
 6
 (1) The claimant could choose review of his claim by the Secretary of HEW and his claim could be approved by HEW under section 435(a)(2)(A), and forwarded to the Secretary of Labor as an initial determination of eligibility with instructions to make or otherwise provide for the payment of the claim in accordance with this part.[10]
 
 
 7
 (2) The claimant could choose review of his claim by the Secretary of HEW and his claim could be denied by HEW under section 435(a)(2)(B) and, if denied, then transferred to the Secretary of Labor for review with an opportunity to submit additional evidence; or
 
 
 8
 (3) The claimant could choose review by the Secretary of Labor under section 435(a)(1)(B), with the opportunity to submit additional evidence.
 
 
 9
 * The sole issue on these appeals is whether claims approved pursuant to section 435(a)(2)(A) (Course (1), supra) are the responsibility of the individual coal operators or of the Black Lung Disability Trust Fund.
 
 
 10
 Both of the claims involved in these appeals are old Part B claims which were previously denied.[11] After the 1977 amendments were passed, both claimants elected review by HEW and both claims were approved. Pursuant to § 435(a)(2) (A), the approved claims were certified to the Secretary of Labor who proceeded to identify a responsible coal operator. When the respective responsible coal operators refused to commence benefit payments, each case was heard de novo by an administrative law judge. The administrative law judges determined that the coal operators were liable for payment of benefits. These decisions were appealed to the Benefits Review Board of the United States Department of Labor. The Review Board overturned the administrative law judges' decisions based on its ruling in Yakubco v. Republic Steel Corp.[12] In Yakubco, the Review Board held that individual coal operators are not responsible for old Part B claims certified under section 435(a)(2)(A). The Review Board determined that these claims were to be paid only from the Black Lung Disability Trust Fund. The Director of the Department of Labor's Office of Workers' Compensation Programs appealed from this Review Board ruling in order to protect the assets of the trust fund.
 
 
 11
 Under the respondent-operators' interpretation of the Act, HEW's determination of eligibility is final and the claims can only be paid from the trust fund. Under the petitioner-Director's interpretation, HEW's determination of eligibility triggers an interim payment mechanism: if a responsible operator can be identified, he must assume the payments, but he has the opportunity to controvert the determination of eligibility. Where there is no responsible operator, then the benefits must be paid out of the trust fund.
 
 II
 
 12
 In interpreting a statute, this court's function "... is to give effect to the intent of Congress."[13] The most persuasive evidence of this intent is the words selected by Congress. The language of section 435(a)(2)(A) and other pertinent sections of the Act leads us to the conclusion that the Director's interpretation is the correct one.
 
 
 13
 Section 435(a)(2)(A) states that the approval of a claim by the Secretary of Health, Education and Welfare is binding "upon the Secretary of Labor" and as an "initial determination of eligibility." The operators' interpretation would render the word "initial" superfluous and would have HEW's determination binding on everyone, not just the Secretary of Labor. The operators contend that "initial" is not superfluous because of section 435(a) (2)(B)(ii). This section provides that after approval by HEW, a claimant can contest the scope or terms of the award. Thus the word "initial" refers to the possibility of further proceedings. This argument is unpersuasive. Section 435(a)(2)(A) refers to determinations of eligibility under the Act. The phrase "initial determination of eligibility" cannot refer to both eligibility and scope and terms; they are two distinct concepts and the import of the term "eligibility" is not so broad as to encompass "scope and terms."
 
 
 14
 It is important to note that the phrase "initial determination" also appears in section 424(a)(1)(A)(i)[14] of the Act under the provisions for operator liability. "(T)here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."[15] The most reasonable inference from this is that an initial determination is a procedural step in claims where an operator may be liable.
 
 
 15
 Section 435(a)(2)(A) also provides that the Secretary of Labor "... shall immediately make or otherwise provide for the payment of the claim in accordance with this part." Section 435 is within Part C of the Act and therefore the phrase "in accordance with this part" can only refer to Part C. The operators contend that this phrase should be limited to relevant Part C provisions and point specifically to section 424(a)(1)(B) which authorizes the use of the trust fund monies where "there is no operator who is required to secure the payment of ... benefits."[16] However, Part C contains provisions for both operator liability and trust fund liability and there is nothing in section 435(a)(2)(A) which would limit the scope of the phrase "in accordance with this part" to one or the other.
 
 
 16
 An examination of the clause "make or otherwise provide," also a part of section 435(a)(2)(A) supports this conclusion. The clause suggests two or more alternative forms of payment. The operators maintain that this refers to section 20(b) of the Black Lung Benefits Reform Act of 1977[17] and the trust fund. Section 20(b), however, revives the payments of benefits from general federal revenues in the event that the trust fund cannot be used. This is obviously an extraordinary measure given Congress's manifest intention to transfer all liability for black lung benefits to the coal industry, and it is unlikely that Congress intended to incorporate this extreme provision into the normal workings of the Act.[18] We find it more reasonable that Congress intended this clause to refer to the trust fund and operator liability as the alternative forms of payment.
 
 
 17
 The provision that the Secretary of Labor "shall immediately make or otherwise provide for the payment of the claim in accordance with this part," also appears in identical form in section 435(b)(1).[19] This section refers to claims where operators are clearly liable; there is no dispute on this point. Again, there is a presumption that identical words used twice in the same act have the same meaning.[20] Adopting the operators' interpretation of this key phrase would result in a widely variant interpretation of the same words and we decline to reach this result.
 
 
 18
 The operators assert next that section 435(a)(3)(A) becomes meaningless if operators are liable for section 435(a)(2)(A) claims. Section 435(a)(3)(A) provides that all reviewed Part B claims other than section 435(a)(2)(A) claims shall be treated as a claim filed under Part C. This includes claims denied by HEW under section 435(a)(2)(B)(i), claims where the claimant elects review by the Department of Labor under section 435(a)(1)(B), and those claims approved by HEW under section 435(a)(2)(A) but disputed by the claimant under section 435(a)(2)(B)(ii). According to the operators, the only reason for the inclusion of section 435(a)(3)(A) was to establish operator liability for these claims; the failure to include the undisputed section 435(a)(2)(A) claims indicates that they retain their character as Part B claims for which operators are not responsible. We believe there is another reason for section 435(a)(3) (A). Claims filed under Part C can be supplemented by the claimant with additional evidence. All Part B cases reviewed under section 435 are at least five years old. Of all these claims, only one type is not considered filed under Part C; those where the claim is approved and the claimant is satisfied with the scope and terms of the award. The rest are treated as filed under Part C to allow claimants to supplement their old claims with new evidence. The only claimants who have no need to supplement their claims are, of course, those content with their award of benefits. These are the undisputed section 435(a)(2)(A) claims. Thus, section 435(a)(3)(A) is a mechanism to allow evidentiary supplement; not a mechanism for determining which claims are the responsibility of operators. Any other conclusion would lead to the anomalous result of having some HEW-approved claims transformed from claims where the trust fund is liable to claims where operators are liable, simply if the claimants dispute the scope or terms of the awards. We do not believe Congress intended this purposeless result.
 
 
 19
 As stated previously, the Act mandates that operators carry insurance or qualify as a self-insurer for those claims they might be liable for. The operator's duty to secure the payment of these benefits is imposed by sections 422[21] and 423[22] of Part C of the Act. Section 423 provides that an operator must secure the payment of benefits "for which he is liable under section 422 of this title." Under section 422, operators are liable for benefits "(d)uring any period after December 31, 1973."[23] The operators contend that there is no duty to insure the liability which arises from Part B claims filed prior to July 1, 1973 and reviewed under section 435(a)(2)(A). In support of this contention, the operators cite the regulation promulgated by the Secretary of Labor to describe the criteria which must be met by an operator to discharge its insurance obligation. 20 C.F.R. § 726.203 (1980),[24] contains an endorsement to a standard policy of workmen's compensation insurance. The endorsement creates liability for claims "first filed against the insured during the policy period." The policy period did not begin until January 1, 1974. Section 435(a)(2)(A) claims are first filed prior to the effective date of the insurance policies. The implication of this regulation is that because the operators are not required to insure those claims, they must not be liable for them. Further, the operators, maintain that Congress would not create a liability that operators are not required to insure and then fine them for not obtaining insurance coverage (section 423(d)(1) establishes civil penalties for the failure to acquire insurance).
 
 
 20
 This argument proves too much. It was established above that claims approved by HEW and disputed by the claimant under section 435(a)(2)(B)(ii) are liabilities for which coal operators are responsible. These claims were also filed prior to January 1, 1974 and are, therefore, not covered by the insurance endorsement clause. Section 435(a)(4) creates a new filing date for these disputed claims but, nevertheless, they are still "first filed" prior to January 1, 1974. The assertion that operators are not liable for section 435(a)(2)(A) claims because they are not required to secure insurance is incorrect; operators are not required (according to the regulation) to insure section 435(a)(2)(B)(ii) claims for which they are definitely liable.[25]III
 
 
 21
 In order to resolve any remaining doubt, we turn to the legislative history of the Reform Act of 1977.[26] The Conference Committee charged with ironing out differences between the House and Senate versions of the Act addressed the issue of all claims under review and the liability therefor:
 
 
 22
 For purposes of payment of benefits, all claims under review shall be treated as part C claims and shall be subject to relevant part C provisions which require payment of benefits by a coal mine operator, other employer, or by the trust fund established by the Black Lung Benefits Revenue Act of 1977.[27]
 
 
 23
 The conference substitute conforms to the Senate amendment in the respect that the Secretary of Labor is a party in any part C proceeding and in retaining the authority of current law for operators to participate in the adjudication of claims for which they may be individually found liable (including part B claims certified or otherwise referred to the Secretary of Labor by the Secretary of HEW ...).[28]
 
 
 24
 The conference substitute provides that the trust fund ... pays benefits in cases in which there is no operator who is required to secure the payment of such benefits or where a liable operator has failed to make payment in a timely manner or cases in which the miner's last coal mine employment was before January 1, 1970 (irrespective that in cases reviewed under section 435 the claims were initially filed as part B or part C claims).[29]
 
 
 25
 Further evidence of congressional intent is found in the remarks of Senator Randolph.[30]
 
 
 26
 All denied part B claimants will be given the option of having their claims reviewed based on existing files by the Secretary of HEW or transferred to the Secretary of Labor for review. In the latter case, the Secretary of Labor will treat the claim like a reviewed part C claim. If the HEW Secretary reviews the claim and it is found not approvable, the claimant will have the opportunity to have his or her claim transferred to the Department of Labor for further review based on any additional evidence that the claimant may submit. If the HEW Secretary approves the claim, it is transferred to the Department of Labor for payment as an initial determination of eligibility. The Labor Secretary will immediately direct that the payments be made from the trust fund or by a responsible operator if a responsible operator is identified. Any responsible operator will have the right to litigate his responsibility and the eligibility of the claimant. If the operator prevails in such litigation, payments to the claimant will cease. The number of such claims in HEW and Labor totals over 200,000. This estimate includes claims of miners and survivors.[31]
 
 
 27
 This legislative history is uncontroverted by the operators and adds to our conviction that Congress intended section 435(a)(2)(A) claims to be the responsibility of individual coal operators.
 
 
 28
 We note that this interpretation is consistent with the logic of the statutory scheme. According to the operators, this reading of the Act is inconsistent for two reasons. First, it is not fair to allow operator controversion of these claims because they could not be controverted when originally filed under Part B. This is true, but it must be remembered that the Reform Act also established more lenient standards of eligibility. With this in mind, the creation of the opportunity of controversion does not seem unfair. There is a possibility that a section 435(a)(2)(A) claimant may have to pay back benefits received if an operator successfully controverts the claim but this is true for all reviewed claims and provides no basis for treating section 435(a)(2)(A) claims differently.
 
 
 29
 Second, respondents maintain that Congress could not have intended this interpretation because it makes review by HEW meaningless. That is, if operators are allowed to controvert claims approved by HEW, HEW approval becomes a superfluous layer of review. Nevertheless, we find that there is a legitimate reason for HEW review which is consistent with our reading of the statute.
 
 
 30
 When the Reform Act was enacted, HEW had all the old Part B claims in their files. Ultimately, these files had to be transferred to the Department of Labor for payment, whether from the trust fund or by an operator. Congress was concerned that these old claims received expedited review and so provided that HEW review the claims before sending them to the Department of Labor. Section 435(a)(2)(A) allows HEW to review these claims and place a claimant on interim pay status pending the identification of a responsible operator. A claimant whose file is reviewed under section 435(a)(2)(A) does not have to wait for the transfer of his file or the identification of a responsible operator. Thus section 435(a)(2)(A) serves a very useful function.
 
 
 31
 We conclude, based on our reading of the statute and the legislative history, that Congress clearly intended individual coal operators to be liable for section 435(a)(2)(A) claims.
 
 
 32
 The decision of the Benefits Review Board is reversed.
 
 APPENDIX B
 
 
 Part B claims are those filed after the inception of the Act and before July 1, 1973. Part C claims are those filed after December 31, 1973. Part C was designed to shift the burden of Black Lung Benefits from the Government to the coal industry. Section 415 claims are those filed between July 1, 1973 and December 31, 1973 and are transition claims designed to bridge the gap between Government responsibility and coal industry responsibility.
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 *
 The Honorable Barbara B. Crabb, United States District Judge for the Western District of Wisconsin, is sitting by designation
 
 
 [1]
 Appendix A, which contained the pertinent provisions of the statute, has been omitted for purposes of publication; a diagram of the statutory scheme is shown in Appendix B
 
 
 [2]
 Federal Coal Mine Health and Safety Act of 1969, Pub.L. 91-173, 83 Stat. 742 (1969)
 
 
 [3]
 Federal Coal Mine Health and Safety Act of 1969, supra, 83 Stat. at 793-98
 
 
 [4]
 Black Lung Benefits Act of 1972, Pub.L. 92-303, 86 Stat. 150 (1972)
 
 
 [5]
 Black Lung Benefits Act of 1972, supra, 86 Stat. at 150-57
 
 
 [6]
 See 115 Cong.Rec. 39995-39999 (1969) (remarks of Sen. Javits); Oversight of the Administration of the Black Lung Program, Hearings Before the Subcomm. on Labor of the Comm. on Human Resources, 95th Cong., 1st Sess. 160, 161 (1977); S.Rep.No. 92-743, 92d Cong., 2d Sess. 20 (1972), U.S.Code Cong. & Admin.News 1972, p. 2305; H.R.Rep.No. 95-151, 95th Cong., 1st Sess. 21 (1977), U.S.Code Cong. & Admin.News 1978, p. 237
 
 
 [7]
 Pub.L. 95-239, 92 Stat. 95 (1977)
 
 
 [8]
 Pub.L. 95-227, 92 Stat. 11 (1977)
 
 
 [9]
 The fund is also used to cover the administrative expenses of the fund itself, and those expenses incurred by the Department of Labor and HEW in connection with the Act. 30 U.S.C. § 934
 
 
 [10]
 Section 435(a)(2)(A), provides that if a claim is approved by HEW pursuant to this section, it is certified to the Secretary of Labor
 and such approval shall be binding upon the Secretary of Labor as an initial determination of eligibility. Upon receipt of that certification, the Secretary of Labor shall immediately make or otherwise provide for the payment of the claim in accordance with this part.
 30 U.S.C. § 935(a)(2)(A).
 
 
 [11]
 McCluskie filed February 2, 1973. Legan filed March 20, 1973
 
 
 [12]
 2 BLR 1-1116 (1980)
 
 
 [13]
 United States v. American Trucking Ass'ns, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940)
 
 
 [14]
 30 U.S.C. § 934(a)(1)(A)(i)
 
 
 [15]
 Atlantic Cleaners and Dyers v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932)
 
 
 [16]
 30 U.S.C. § 934(a)(1)(B)
 
 
 [17]
 Note 6, supra, 92 Stat. at 106
 
 
 [18]
 The Legislative history of section 20(b) supports this conclusion:
 The intent underlying this provision is to essentially "revive" the payment provisions of the current law in the event payments cannot lawfully be made from the trust fund. An example (and perhaps the only imaginable eventuality which could trigger this provision) would be a Supreme Court finding of legal infirmity going to an aspect of the trust fund sufficient to prevent the trust fund from adequately assuming the purpose and responsibility for which it was established.
 H.R.Rep.No. 95-864, 95th Cong., 2d Sess. 27 (1978), U.S.Code Cong. & Admin.News 1978, p. 320. We do not feel reluctant to turn to the legislative history in this case because we believe that there has been the prerequisite showing of uncertainty in the text of the statute. See note 24, infra.
 
 
 [19]
 30 U.S.C. § 945(b)(1)
 
 
 [20]
 See note 15, supra
 
 
 [21]
 30 U.S.C. § 932
 
 
 [22]
 30 U.S.C. § 933
 
 
 [23]
 Coal operators are not responsible for the payments of an approved state worker's compensation adequately covers all black lung benefit claims. To date, no state has enacted an approved plan. See 30 U.S.C. §§ 931-33
 
 
 [24]
 This regulation has been in effect since 1973
 
 
 [25]
 We do not decide by our ruling in this case whether the claims in issue are in fact covered by insurance. Nor are we deciding whether operators are required by the Act to acquire insurance for Part B claims reviewed under section 435. All we are deciding is that 20 C.F.R. § 726.203 does not require operators to insure against these reviewed claims. The Act itself may require operators to insure against these claims. Section 422 states that operators are liable for benefits during any period after January 1, 1974. Approved claims under section 435 are retroactive to January 1, 1974, the first day for which operators are liable. Sections 435, 422, and 423, when read together, appear to establish a mandate requiring operators to insure section 435 claims. Further, 20 C.F.R. § 727.105 clearly imposes liability on operators for these claims. This regulation came into existence on August 18, 1978, and operators were on notice that they might have been liable for these claims. Their failure to act does not shield them from the specific statutory mandate of liability
 Surprisingly, the operators assert that the Department of Labor's interpretation, i.e., the regulations under 20 C.F.R. § 727 are not entitled to any weight and yet rely on a specific regulation, 20 C.F.R. § 726.203, to support their own argument. Although the Director's interpretation may be entitled to some deference see Udal v. Tallman, 380 U.S. 1, 85 S.Ct. 1325, 13 L.Ed.2d 616 (1965), and Alford v. American Bridge Division, United States Steel Corp., 642 F.2d 807 (5th Cir. 1981), we do not reach this issue; there is sufficient evidence elsewhere for us to conclude that operators are liable for the claims in issue.
 
 
 [26]
 Although we do not agree with the operators' arguments, they do raise some valid questions and point out an uncertainty in the text of the statute
 
 
 [27]
 H.R.Rep.No. 95-864, 95th Cong., 2d Sess. 22 (1978), U.S.Code Cong. & Admin.News 1978, p. 315
 
 
 [28]
 Id. at 23, U.S.Code Cong. & Admin.News 1978, p. 316
 
 
 [29]
 Id. at 25, U.S.Code Cong. & Admin.News 1978, p. 318
 
 
 [30]
 Senator Randolph was one of the Reform Act's sponsors and a member of the Conference Committee. Though not controlling, his remarks are entitled to some weight. See e.g., Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979)
 
 
 [31]
 124 Cong.Rec.S. 1444 (daily ed. Feb. 7, 1978)