**UNITED STATES of America, Plaintiff,**

v.

**Harold TURNER, Monroe Swan, Barbara Henderson and Symuel Smith, Defendants.**

No. 83–C–2036.

United States District Court, E.D. Wisconsin.

Jan. 24, 1985.

Lawrence Meuwissen, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Defendants Monroe Swan and Symuel Smith, pro se.

## DECISION AND ORDER

WARREN, District Judge.

This is an action by which the United States Government seeks to enjoin the defendants from engaging in conduct relative to the promotion of abusive tax shelters, pursuant to 26 U.S.C. § 7408. The Court transferred this case to Magistrate Aaron E. Goodstein for a recommendation on the Government's petition for relief. Following an evidentiary hearing held on July 2 and 3, 1984, the Magistrate, on October 24, 1984, issued his findings of fact and conclusions of law, and recommended that the Court grant the Government's request for injunctive relief against defendant Smith; deny the Government's request for injunctive relief against defendant Swan; and dismiss the complaint against Mr. Swan.[1]

Both the Government and Mr. Smith have objected to portions of the Magistrate's Recommendation. The Government contends that the Magistrate erroneously concluded that an individual must personally make or furnish a gross valuation statement in order to be liable under 26 U.S.C. § 6700, which statute defines conduct constituting the promotion of an abusive tax shelter. Smith argues essentially that the Magistrate's Recommendation does not specifically refer to evidence adduced at the hearing that would implicate him as having promoted an abusive tax shelter or that would justify the issuance of an injunction. Having reviewed the transcript of the evidentiary hearing and the submissions of the parties in response to the Magistrate's Recommendation, the Court is satisfied that the Recommendation is sound in all respects, and it will therefore be adopted by the Court. A brief discussion of the arguments presented by the parties and the Court's decision follows.

The facts of this case were sufficiently detailed in the Magistrate's Recommendation and need not be repeated here. Although defendant Smith has raised several ill-defined objections to the Magistrate's findings, the Court will only address specific facts as they relate to Smith's objections, pursuant to 28 U.S.C. § 636(b)(1). The Government does not object to the Magistrate's findings of fact.

## A. GOVERNMENT'S OBJECTIONS

The Government's sole objection pertains to the Magistrate's interpretation of 26 U.S.C. § 6700(a)(2), which must be read in conjunction with section 6700(a)(1). In addition to the requirements of section 6700(a)(1), a person cannot be convicted of promoting an abusive tax shelter unless he or she:

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter.... 26 U.S.C. § 6700(a)(2).

The Magistrate interpreted this section literally and found that defendant Swan was not liable under § 6700 because the record did not reflect that *he* had "ever actually explained the operation of the Saxon plan to any investor or potential investor." (Magistrate's Recommendation, page 14). The Government argues that § 6700(a)(2) should be broadly construed such that an individual could be held liable if another with whom he was associated either made or furnished a statement described in § 6700(a)(2)(A) or (B).

The Government concedes that there is no evidence which indicates that Monroe Swan directly and personally made or furnished a gross overvaluation statement to any investor. Gross overvaluation state-

---

1. As the Magistrate noted in his Recommendation, defendants Harold Turner and Barbara Henderson had previously consented to the entry of injunctive orders against them and were not involved in the proceedings before the Magistrate.

ments were made by Harold Turner and Barbara Henderson, however, and the Magistrate also found that Smith had made such statements. Accordingly, the Government claims that Swan should be held liable for violations of § 6700 under any or all of three theories: (1) because the four occupants of the Farwell office were partners, and Wisconsin law prescribes that partners are jointly and severally liable for everything chargeable to the partnership; (2) under the theory of vicarious liability for concerted action, since § 6700 parallels, in certain respects, the law of torts; and (3) under theories of conspiracy and aiding and abetting. Clearly, the Government advocates an extremely broad reading of § 6700(a)(2), one that would impose liability upon anyone who was involved, either directly or tangentially, with promoting abusive tax shelters.

Section 6700 became effective on September 4, 1982 as part of the Tax Equity and Fiscal Responsibility Act of 1982, P.L. 97-248, 96 Stat. 612. Due to the recent enactment of the statute, few courts have been called upon to interpret and apply the provisions of § 6700. In those cases involving § 6700, however, the Government has never sought to impose liability on anyone other than the individual directly responsible for making or furnishing the type of fraudulent statement described in § 6700(a)(2)(A) or (B). See *United States v. Savoie*, 594 F.Supp. 678 (D.La.1984); *United States v. White*, 583 F.Supp. 1118 (D.Minn.1984); *United States v. Buttorff*, 563 F.Supp. 450 (N.D.Tex.1983). The following observation also seems to indicate that only the person who actually made or furnished the fraudulent statement is liable under § 6700:

> The person subject to penalty must both participate in organization or sale of tax shelter interests and make or furnish a fraudulent statement, a statement he knows or has reason to know is false, or a gross overvaluation. The penalty does not apply to those who don't do both— for example, a seller of interests in an abusive shelter who innocently repeats a statement fraudulently made by a promoter which the seller has no reason to know is false.

34 Am.Jur.2d *Federal Taxation* § 9051 (1985).

 The statute itself is neither vague nor ambiguous, yet the Government proposes that the Court interpret § 6700 more broadly that its own terms prescribe. As the Court noted, there is no precedent for doing so, and the observation quoted above indicates that a broad interpretation would be specious. While the plaintiff argues that a liberal reading of § 6700, one which would impute liability to others somehow associated with the maker or furnisher of the fraudulent statement, would comport with the intent of Congress, it is nonetheless true that congressional intent is primarily ascertained from the words of the statute. *Janowski v. International Brotherhood of Teamsters Local No. 710 Pension Fund, et al.*, 673 F.2d 931, 936–37 (7th Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982); *Director, Office of Workers' Compensation Programs, United States Department of Labor v. Forsyth Energy, Inc.*, 666 F.2d 1104, 1107 (7th Cir.1981). Since the statute plainly states that "any person who … makes or furnishes" a fraudulent statement is liable, the Court believes that it would be inappropriate to read more into these words than their literal meaning suggests. Accordingly, the Government's objection to the Magistrate's Recommendation is rejected.

**B. DEFENDANT SMITH'S OBJECTIONS**

On November 6, 1984, defendant Smith filed a motion to dismiss this action or, in the alternative, a motion for summary judgment. Smith also filed a response to the Magistrate's Recommendation. Since the Magistrate has already held an evidentiary hearing in this case, Smith's motions would be untimely. Therefore, the Court will treat them and their supporting arguments as additional objections to the Magistrate's Recommendation.

Smith has raised several objections to the Magistrate's proposed findings of fact and conclusions of law. First, Smith objects to the Magistrate's failure to find that a partnership did or did not exist between Turner, Henderson, Swan and Smith. The Government also contends that it is crucial to the decision in this case that a finding be made as to whether a partnership existed.

■ As the Magistrate stated on page 14 of his Recommendation, the imposition of liability under § 6700 does not require a finding that a partnership or other entity was created for the purpose of promoting abusive tax shelters. The Court has already found that the existence of a partnership would not impute liability to all other partners simply because one partner had made or furnished fraudulent statements in violation of 26 U.S.C. § 6700(a)(2). Even so, for the purpose of resolving this issue should an appeal ensue, the Court now decides that Lease Marketing and Management was a partnership between Harold Turner, Barbara Henderson, Monroe Swan and Symuel Smith for the purpose of promoting tax shelters. This finding is based upon the testimony of Harold Turner. (Tr. 225, 251–253).

Smith also objects that the Magistrate's Recommendation did not refer to specific evidence which demonstrated Smith's "significant role" in the sale of tax shelters. On pages 9 and 10 of his Recommendation, the Magistrate details Smith's expertise in financial matters and his involvement in the sale of the Saxon tax shelter. These findings are based, *inter alia,* upon Turner's testimony that Smith was a "walking encyclopedia" (Tr. 226); upon Smith's testimony that he answered questions at the Farwell office about the Saxon Plan (Tr. 73); upon Smith's testimony that he went to Don Tate's house to explain the Saxon Plan (Tr. 77); upon Smith's testimony that he explained to clients the potential effect of the Saxon Plan upon Schedule C of their tax returns (Tr. 97); and upon Tate's testimony that he spoke with Smith about the Saxon Plan (Tr. 165, 169). In addition to these specific references, the remainder of the transcript of the evidentiary hearing is replete with evidence of Smith's instrumental role in the sale of the tax shelters.

Smith's third objection is that there is no evidence upon which the Magistrate or the Court could conclude that profits from the sale of the Saxon leases were divided evenly between Turner, Henderson, Swan and Smith. While Smith believes that this finding was made in relation to the Government's contention that a partnership existed, the Court believes that it is more pertinent to the question of Smith's integral role in selling the Saxon tax shelters. In either case, Smith's testimony on pages 84–91 of the transcript, along with exhibits 27 and 28 (copies of commission checks), is evidence of the four-way split of Saxon-related profits. Neither this finding nor the existence of a partnership, however, is necessary to conclude that Smith is liable under § 6700, and his objection, therefore, is largely irrelevant.

Smith's fourth objection is that there is no basis upon which an injunction against him should issue. Pursuant to 26 U.S.C. § 7408, the Court may grant injunctive relief if it finds.

(1) that the person has engaged in any conduct subject to penalty under section 6700 ..., and

(2) that injunctive relief is appropriate to prevent recurrence of such conduct....

26 U.S.C. § 7408(b).

■ The Magistrate found that Smith's "standing in the community, as well as his continued involvement in the marketing of energy management systems," justified the issuance of an injunction. The Court agrees, based upon Smith's testimony that he is involved with ROI Unlimited, which sells unspecified electronic devices, and was involved with the sale of various other energy saving items. (Tr. 60–61). Exhibit 24 is a copy of the corporate profile of Weatherman Energy Management Service, Inc., another program with which Smith was involved. (Tr. 61). The evidence clearly demonstrates that Smith has a history of involvement with energy-related tax shelters and continues to be so involved. Ac-

cordingly, the Court finds that injunctive relief is appropriate in order to insure that Smith does not again engage in conduct in violation of § 6700. Furthermore, the Court finds that the traditional factors considered in deciding the appropriateness of injunctive relief have been satisfied.[2] As the Court stated in *Buttorff,* such a finding is essentially superfluous once a court decides that an injunction is necessary to prevent further violations of § 6700, since "(t)he legislative process has already taken these factors into consideration in its decision to address the promotion of abusive tax shelters." 563 F.Supp. at 454.

Finally, Smith has lodged a general objection to the sufficiency of the proceedings before the Magistrate and requests that a full evidentiary hearing be held before the Court. Under 28 U.S.C. § 636(b)(1)(B) and (C), the district court may designate a magistrate to conduct evidentiary hearings and submit proposed findings of fact and recommendations to the district court in matters such as this. The parties are allowed to file objections to the proposed findings and recommendations within ten days after being served with a copy thereof. This procedure has been followed in this case, and defendant Smith has been accorded a full and fair evidentiary hearing. His objection to the proceedings before the Magistrate is unfounded.

Accordingly, the Court hereby adopts the Magistrate's recommendation and:

1. Grants the Government's request for injunctive relief against Symuel Smith;

2. Denies the Government's request for injunctive relief against Monroe Swan, and dismisses the complaint against defendant Swan;

3. Enters the following order, as recommended by the Magistrate, that SYMUEL H. SMITH, personally and by his agents, servants or employees, is hereby permanently enjoined and restrained from directly or indirectly and by any means;

A. Taking any action in furtherance of the organization, promotion, advertising, marketing, selling or offering for sale of the Saxon Program.

B. Representing that investors in the Saxon Program will be entitled to deductions or credits, for Federal income tax purposes, on the Saxon Program property with respect to which the gross valuation overstatement is made, including credits against tax for the investment tax credit or the business energy credit, and from furnishing or distributing materials, and oral or written information which so indicated.

C. Organizing or assisting in the organization of, or selling or participating in the sale of interests in, any partnership, trust, entity, investment plan, or other plan or arrangement that purports to entitle participants to tax credits, tax deductions, or other tax benefits based upon any of the following:

(1) any representation of value of any asset or interest therein to be sold, where such representation exceeds 200 percent of the correct fair market value of that asset or interest; or

(2) any transaction or series of transactions that he knows or has reason to know a) offers little or no realistic possibility of economic gain *or* b) depends upon financing that is non-recourse either expressly or because of an unreasonably long repayment period *or* c) depends upon a market for services or property that cannot be reasonably expected to exist.

D. Engaging in any other conduct subject to penalty under 26 U.S.C. § 6700.

---

**2.** The following considerations are to be made in deciding whether an injunction should be granted:
 1. the threat of irreparable harm for which there is no adequate remedy at law;
 2. whether the threatened injury to the plaintiff outweighs the harm an injunction might inflict on the defendant;

 3. whether the plaintiff has a reasonable likelihood of success on the merits;
 4. whether the issuance of a preliminary injunction would disserve the public interest. *American Can Company v. Mansukhani, et al.,* 742 F.2d 314 at 325 (7th Cir.1984).

## MAGISTRATE'S RECOMMENDATION TO JUDGE ROBERT W. WARREN

October 24, 1984

AARON E. GOODSTEIN, United States Magistrate.

This action was brought by the United States government under provisions of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324 (TEFRA). The government seeks permanent injunctive relief against defendants Monroe Swan and Symuel Smith, as provided by § 321(a) of TEFRA, now codified at 26 U.S.C. § 7408. Defendants Harold Turner and Barbara Henderson previously consented to the entry of injunctive orders against them, and they have not been involved in these proceedings except as witnesses.

The case was transferred to this court by Judge Robert W. Warren for purposes of obtaining a recommendation on the government's petition for relief against defendants Smith and Swan. On July 2 and 3, 1984, this court held an evidentiary hearing. Post-hearing memoranda have now been filed. The following recommendation includes this court's findings of fact and conclusions of law prepared in accordance with Rule 52(a), Fed.R.Civ.P. For purposes of clarity, however, a brief discussion of the statutory framework underlying this case will precede those findings and conclusions.

### I. APPLICABLE STATUTES

The many amendments to the Internal Revenue Code embodied in TEFRA include two code sections providing new enforcement powers directed at "abusive" tax shelter schemes. Under 26 U.S.C. § 6700, civil penalties may be imposed as follows upon,

(a) ... Any person who—

(1)(A) organizes (or assists in the organization of)—

(i) a partnership or other entity,

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reasons of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter,

§ 6700(b) defines a "gross valuation overstatement" as one that exceeds 200 percent of the correct valuation of goods or services, where that value is directly related to the amount of a deduction or credit allowable under Chapter 1 of the Code.

In 26 U.S.C. § 7408, Congress gave the government the right to seek, and district courts the power to grant, injunctions against persons who have engaged in conduct subject to penalty under § 6700. It is under this section that the government brought the instant action. In order to grant injunctive relief under § 7408(b), the court must find (1) that the defendant is liable under § 6700 *and* (2) "that injunctive relief is appropriate to prevent the recurrence of such conduct."

The legislative history of these relatively new provisions makes the purpose behind them quite clear. Prior to the enactment of §§ 6700 and 7408, the Internal Revenue Service was required to wait until investors filed their tax returns before proceeding against potentially abusive tax shelter schemes. The new provisions allow the I.R.S. to attack the "source", *i.e.* the *promoters*, of these schemes, and to attack them as soon as it is apparent that they are engaging in prohibited conduct. The I.R.S. is thus able to protect not only the "integrity of the tax laws," but also the innocent

investor. *See* S.Rep. No. 494, 97th Cong., 2d Sess. 266–269 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 781, 1014–1017.

The language of both §§ 6700 and 7408 is broad, and few courts have yet had the opportunity to interpret their provisions. The legislative history sheds little direct light on how words like "participates" (§ 6700(a)(1)(B)) and "appropriate" (§ 7408(b)(2)) should be interpreted. Nevertheless, the very breadth of these terms, as well as the clear declaration of Congress that an extensive campaign against abusive shelters was contemplated in the enactment of these sections, suggests that they should be broadly construed.

## II. FINDINGS OF FACT

### The Principals

Symuel Smith is an adult resident of the Eastern District of Wisconsin. Mr. Smith is the holder of a Bachelor's degree in Business Finance and a Masters degree in Hospital Administration. He also studied engineering physics at Fisk University for two years and received electronics training in the Army. Between 1952 and 1981, Mr. Smith served in various administrative capacities in hospitals and related social service institutions throughout the nation, frequently serving as chief executive at these institutions. In 1978, he was appointed Director of Institutions for Milwaukee County, Wisconsin. These positions frequently involved institutional budgeting activity. Since leaving the Milwaukee County post in 1981, Mr. Smith has been involved in various business pursuits. He is a member of the National Association of Securities Dealers.

Monroe Swan is also an adult resident of the Eastern District of Wisconsin. He holds a Bachelor's degree in Sociology and History from the University of Wisconsin at Milwaukee, and did some postgraduate work in public administration. He served approximately eight years as a Wisconsin State Senator. In October of 1980, he was convicted of misapplying the services of federally funded summer youth workers.

Harold Turner is the owner of a business called Capitol Resources and Investments (CRI) that sells insurance and investments. Barbara Henderson has been associated with Mr. Turner at CRI, which was located at 1840 N. Farwell Ave. in Milwaukee in 1982 and 1983.

In the latter part of 1982, Monroe Swan was the owner of a water softening equipment franchise known as Rain Soft, Inc. He was invited by Mr. Turner to share office space at 1840 N. Farwell in order to market his water softener equipment with the assistance of Mr. Turner and Ms. Henderson.

In late September of 1982, Harold Turner met Symuel Smith, and soon afterward Smith attended an investment seminar organized by Mr. Turner and Ms. Henderson. In October or November of 1982, Mr. Smith began to occupy office space at 1840 N. Farwell. His original purpose in coming to those offices was to assist in the marketing of Mr. Swan's water softener equipment.

During this same period, CRI began to investigate other investment opportunities for its insurance clients. Mr. Smith became involved in the process of reviewing various investment program materials that came into the office. For example, one such program, Philatelic Leasing, was rejected by Mr. Smith as being "flakey."

At about that same time, Mr. Turner received materials concerning the "Saxon Energy Brain Leasing Program." Mr. Smith reviewed these documents and advised Mr. Turner that the Saxon program looked like a good plan to offer to CRI's insurance clients, although he felt that there might be a problem with overvaluation.

### The Plan

The Saxon program involved the lease of computerized temperature/time equipment designed to control heating and air conditioning cycles in buildings devoted to various manufacturing and commercial uses. This equipment is trade marked as the "En-

ergy Brain", and is manufactured for Saxon Energy Corporation (Saxon), 21 East 40th Street, Suite 2100, New York, New York, 10016, by Enersonics, Inc., 370 7th Avenue, Suite 434, New York, New York, 10018, under contract with C.S. & M, Inc. of Ludlow, Massachusetts.

Enersonics, Inc., produced five different models of the Energy Brain in 1982. These units are "sold" to Saxon at prices ranging from $80,000 for the least expensive unit (designated the "001") to $2,350,000 for the most costly model. The price is "paid" by Saxon by a small cash down payment, the exact amount of which is not stated in the documents that are part of the record. The balance of the price is represented by a promissory note that by its terms is due and payable at the end of 25 years and is payable *only out of income* (*i.e.*, the energy savings resulting from use of the equipment).

Saxon then enters into a 20 year lease with an investor who "leases" an energy brain unit for an advance lease payment (in the case of the least expensive model) of $10,000. The investor's initial lease payment may be made with a promissory note to be paid when the investor obtains the income tax refund that his participation in the program is expected to produce. All of the Milwaukee-area persons referred to in this case invested in this least expensive model, the "001", and some signed such promissory notes for their initial payment.

The purported tax benefits arise because Saxon represents that, pursuant to § 48(d) of the Internal Revenue Code, it will pass through to the investor/lessee the investment tax credit (§§ 38 and 46–48 of the Code) and the business energy credit, (§ 46(a)(7) of the Code), both of which are computed on the basis of the price of Saxon's purchase from Enersonics (which is represented to be its fair market value). For all of the Milwaukee investors, this was the $80,000 figure.

After signing the investor to a lease, Saxon, through an affiliated or closely related company, purportedly arranges to find a "user" for that unit and further arranges to have the unit installed on the user's property. The same company then "manages" the system for the investor in return for a "maintenance fee."

The plan calls for the user to pay the investor 50 percent of the energy savings resulting from the installation of the Energy Brain. The investor in turn pays 15 percent of these gross receipts to the management company and 75 percent of the net receipts to Saxon as rental payments.

As noted above, the values of the investment tax credit and the business energy credit to a particular taxpayer depend on the fair market value (represented by the price) that the taxpayer purports to pay for the item purchased. The correctness of the valuation of Energy Brain units is thus critical to determining its legality as a tax shelter.

Kenneth Cleverly, an engineer (employed by the I.R.S.) experienced in valuing industrial equipment, including temperature/time equipment, offered his opinion that the 001 model Energy Brain was, in fact, grossly overvalued within the meaning of 26 U.S.C. § 6700(b)(1). Mr. Cleverly testified that the fair market value of the 001 unit was not more than $1,000. His opinion was based on a visit to the Enersonics plant in Massachusetts where the more expensive 003 model Energy Brain was being manufactured, as well as on his examination of various documents describing the 001 unit. He testified that this unit was simply a series of thermostats that could be easily duplicated. He stated that the unit was best suited for a "supermarket type" building of no more than 10,000 square feet.

In addition, Mr. Cleverly utilized the income stream approach to determine the fair market value of the unit. This approach was used, because the purchase-price promissory note by its own terms could only be paid from income. For purposes of these calculations Mr. Cleverly used the Saxon prospectus and assumed that the unit could produce a 20% annual energy cost saving for a 10,000 square foot building, although he did not in fact believe

the unit capable of achieving such a rate. Based on an initial energy cost of $1.80 per square foot (described as a "midwest figure") and allowing for an increase in that figure of 10% per year, Mr. Cleverly concluded that the present value of the income stream generated by the 001 unit (discounted at 12%), cut in half to allow for the portion of energy savings assigned to the user, would be about $10,302. This figure also includes a 7½% maintenance fee deduction. When that figure is added to the $10,000 down payment required by Saxon, it becomes apparent that the 001 unit could not produce enough income to pay off the $80,000 promissory note. Under this method of computation, the maximum fair market value of the 001 unit should not exceed $20,000.00 according to Cleverly.

### The Operation

On December 23, 1982, Harold Turner and Symuel Smith opened a checking account at the University National Bank in Milwaukee. The account was opened under the name of "Lease Marketing and Management" (LM & M). Defendants Smith and Swan have argued that LM & M was merely an account designed to keep funds coming into the office for CRI insurance business separate from those coming in for other investments, such as Saxon and the water-softener operations. The government contends that LM & M was a partnership created to sell investments, and indeed Harold Turner called it a partnership in his testimony. As will be seen below, however, it is not critical for purposes of applying these statutes that LM & M be characterized as a partnership or any other type of association or group. For purposes of this recommendation the term "LM & M" will refer to the group of four persons (Turner, Henderson, Swan and Smith) who were working out of the office at 1840 N. Farwell.

During the ensuing months, all four LM & M members were involved in the sale of Saxon "leases." Specifically, Mr. Smith served as the office "expert" on financial matters—a "walking encyclopedia," in Mr. Turner's words. He was available for consultation with other LM & M members or with any CRI clients that came to the office to discuss Saxon with Mr. Turner or Ms. Henderson. Mr. Smith is listed as a consulting expert on several Business Advisor's Questionnaires (*see* exh. 8, 11, 17) generated in connection with Saxon investments; he signed one (Don and Carol Tate's, exh. 17) as a business advisor. He went to the Tates' home to explain the Saxon program to a small group of potential investors; at least one of them, Mr. Tate himself, subsequently invested in Saxon after further discussing the plan with Mr. Smith. Mr. Smith on several occasions explained the operation of "Schedule C" to investors. That schedule of an income tax return concerns business deductions.

Mr. Smith performed several other duties in connection with the Saxon program. On December 31, 1982, for example, he travelled to New York to meet with Saxon officials and deliver to them a payment of investor funds due before year's end. While in New York, Mr. Smith secured from Saxon officials the Energy Brain unit serial numbers and other documents that would correspond to each investor. These numbers and documents were to be used in passing on the energy and investment tax credits to those investors. Mr. Smith created two joint venture investments, denominated "alpha" and "beta", that were designed to permit investment by groups of persons who individually could not afford to purchase a whole Saxon "lease." He also devised a system for recording the cash flow into the LM & M account from Saxon and Rain Soft activities. *See* exhibit 25.

Mr. Swan performed numerous duties at 1840 N. Farwell. Some of these duties were clerical in nature including some typing. He was also available for consultation with investors. He conferred with at least one investor, Marvin Pratt, on the legality of the Saxon program. Mr. Swan did not bring any clients into the office, though.

While they were involved in LM & M, both Mr. Smith and Mr. Swan continued to be involved in the water softening busi-

ness. Mr. Swan continued to market softeners under his Rain Soft franchise. Mr. Smith devised a sales plan in which the softeners would be sold through something called the "Vestmark Group." Eventually Mr. Swan's inventory of softeners was sold.

In addition to their specific functions, both Mr. Smith and Mr. Swan provided a certain public relations boost to LM & M through their standing in the community. This was one of the reasons Harold Turner sought to bring them into his operation. One investor, Marvin Pratt, specifically testified that their presence, and particularly Mr. Smith's, reassured him of the soundness of the Saxon venture. Mr. Pratt's wife had some reservations about Mr. Swan's participation, but she was ultimately persuaded to invest by Ms. Henderson.

Profits from the sale of Saxon "leases" were to be divided equally among the four members of LM & M. After a time it becomes difficult to ascertain the source of the funds coming into the LM & M account. Nevertheless, it is clear that both Mr. Smith and Mr. Swan, as well as Ms. Henderson and one John Bell (who had referred Don Tate to LM & M) received checks from the account on January 10, 1983. These checks were designated as commission checks. *See* exh. # 26 and 27, check nos. 1001–1004; *see* also exh. 28. (Note, the checks are erroneously dated "1982"). At that time, the funds in the account consisted exclusively of Saxon revenues collected from investors Leedale Kern, Mitchell, Tate, Barrow, Young, and Grady Kern. Marvin Pratt's check was one of several that had been received by then but was never actually deposited in the account.

In June or July of 1983, Mr. Smith left the North Farwell offices to join the National Revenue Corporation. He continues to be involved in the marketing of energy management systems through an enterprise of his called "R.O.I. Unlimited." As recently as the spring of 1984, Mr. Smith has been in contact with a company called Weatherman Energy Management Service,

Inc., regarding the sale of energy management systems manufactured in Milwaukee.

Mr. Swan apparently left the North Farwell offices sometime in 1983, although the record does not reflect a date. Mr. Turner has since moved CRI's offices to a new location on Capitol Drive, and has not had any dealings with either Mr. Smith or Mr. Swan since that time. There is no indication in the record that Mr. Swan has been, or is now, involved in any sort of marketing or business venture since leaving the North Farwell office.

Although materials regarding a Saxon leasing program for 1983 did arrive in the office sometime in the spring of that year, none of the parties involved in this case ever dealt with those materials. The Saxon operation apparently has been shut down pending the results of an investigation by the Attorney General of New York.

## III. CONCLUSIONS OF LAW

Both Symuel Smith and Monroe Swan participated in the sale of interests in the "Saxon Energy Brain Leasing Program" within the meaning of 26 U.S.C. § 6700(a)(1)(B). Symuel Smith served as a general financial expert, consulting with potential investors and members of LM & M on the legality and operation of the Saxon plan, and performing other administrative functions. Monroe Swan was also available for consultation and was asked about the legality of the plan on at least one occasion by an investor. He also performed general office work. The consultations conducted by both those defendants went beyond the "referral stage."

Priced for sale at $80,000, the Saxon Energy Brain "001" unit, also known as "EB1," was overvalued by more than 200%, which therefore constitutes the first prong of a "gross valuation overstatement" in accordance with § 6700(b)(1)(A). As the selling price is represented to be the fair market value of the 001 unit, and therefore the figure upon which the Investment and Energy tax credits are computed, that overstatement would be directly related to the amounts of those credits which is the

second prong of the definition of a gross valuation overstatement. 26 U.S.C. § 6700(b)(1)(B). Any defendant who stated that price to any person as part of an effort to induce them to invest in the Saxon plan would thereby have furnished a "gross valuation overstatement" within the meaning of § 6700(a)(2)(B).

In explaining the operation of the Saxon plan to potential investors, and to at least one person who ultimately invested in the plan, Symuel Smith necessarily furnished gross valuation overstatements in the manner described above. In doing so, Mr. Smith engaged in conduct subject to penalty under 26 U.S.C. § 6700.

The record does not reflect that Monroe Swan ever actually explained the operation of the Saxon plan to any investor or potential investor. Even in attesting to its legality, which the government contends Swan did, it would not be necessary to represent the value of a unit explicitly. Since a person who participates in the sale of an interest must also make or furnish a gross valuation overstatement (See § 6700(a)(1)(B) and (2)(B)), the government therefore has not proved that Monroe Swan is subject to a penalty under 26 U.S.C. § 6700.

Entry of an injunction against Symuel Smith is appropriate within the meaning of 26 U.S.C. § 7408(b)(2). Mr. Smith's standing in the community, as well as his continued involvement in the marketing of energy management systems, suggests that future violations of 26 U.S.C. § 6700 by Mr. Smith are reasonably possible.

Even had this court concluded that the government had proved that Monroe Swan was subject to penalty under 26 U.S.C. § 6700, entry of an injunctive order against Mr. Swan would not be appropriate. There is no indication in the record that he has been involved in business ventures of any kind since his involvement with the Saxon plan ended, or that he intends or desires to become involved in the type of activity that would warrant injunctive relief.

## IV. DISCUSSION

Both defendants Smith and Swan went to great lengths to challenge the government's assertion that LM & M was a "partnership" created to market interests in the Saxon plan. As 26 U.S.C. § 6700 is structured, it is not necessary for liability under this statute that LM & M have been a partnership or even an "entity" at all. The "entity" at issue here is the Saxon plan. Whatever the arrangement was between the four principals of LM & M, the record reflects that both defendants Smith and Swan participated in the sale of interests in the Saxon plan. 26 U.S.C. § 6700(a)(1)(B) does not require that these defendants be partners with each other or with the organizers of the plan they seek to promote; it requires only that they participate, jointly or individually, in the sale of plan interests.

Participation is not all that 26 U.S.C. § 6700 requires. As stated previously, in order for liability to attach, one who has participated in the sale of a plan interest must *also* make or furnish one of the types of statements prohibited by § 6700(a)(2). In this case the government has charged that both Mr. Smith and Mr. Swan furnished gross valuation overstatements in violation of § 6700(a)(2)(B).

■ The government is correct in its assertion that scienter is not required to find a violation under that provision, as distinguished from § 6700(a)(2)(A), which requires that false or fraudulent material statements be made with knowledge or reason to know of their falsity. Nevertheless, the record simply does not reflect that Monroe Swan ever made a statement to anyone that the 001 unit was worth, or even priced at, $80,000. None of the investor witnesses recalled that Mr. Swan consulted with them on how the plan worked, although he may have consulted with other LM & M principals. It is not enough that investor Marvin Pratt asked him whether the plan was legal and that he was present when Henderson answered that inquiry; or that he was present in the office and shared the desire of the other three defendants that Saxon plan interests be sold; or

even that he even performed clerical work toward that end. In paragraph four of its proposed findings of fact, the government attempts to "bootstrap" fulfillment of this requirement by submitting that since Swan displayed considerable knowledge of the program in his questioning of witnesses, it is "obvious" that he took part in the review of investment brochures. The fact that Mr. Swan exhibited after-the-fact familiarity with these matters does not satisfy the government's burden regarding this statutory requirement as to the time in question. Section 6700 penalties apply only to those who *both* participate in sales *and* make prohibited statements. *See* 34 Am.Jur.2d, *Federal Taxation* ¶ 9051 (1984).

Mr. Smith, on the other hand, explained the operation of the plan at one meeting (at least) and in subsequent consultations with Don Tate and others. This is much in keeping with his role as LM & M's financial "expert." Explaining the plan, and particularly its tax ramifications, would have to include a statement of the purported value of the unit, upon which figure all the tax benefits were to be based.

Defendant Smith strenuously asserted that his role at LM & M was ministerial or administrative in nature and that he did not "sell anything." It is clear from the record, however, that he played a substantial, if not dominant, role in convincing Don Tate to invest in the Saxon program. Mr. Smith's characterization of himself as a mere functionary does not square with his professed desire to assure that LM & M records were accurately kept, or that the serial numbers were secured during his trip to Saxon's New York offices in December of 1982, or with his receipt of an equal share of LM & M "profits."

Both defendants Swan and Smith have argued that the I.R.S. investigation that lead to the filing of this action was misdirected and should have focused on persons higher in the Saxon hierarchy. Mr. Smith, in particular, suggested that a more appropriate target would have been Richard Bell, the California broker/dealer for Saxon, and the person who first sent Saxon materials to Harold Turner. It may well be that others closer to Saxon would be liable under 26 U.S.C. § 6700 and therefore subject to be enjoined under 26 U.S.C. § 7408. Nonetheless, persons lower down in the chain may also be liable if, as here, their conduct falls within the broad range of "participation" contemplated by § 6700(a)(1)(B). In fact, it is entirely consistent with Congress' intent to protect innocent investors that the I.R.S. focus its efforts on those who deal directly with those investors as well as on those who organize abusive entities or plans.

26 U.S.C. § 7408 permits a court to issue injunctions against persons subject to penalty under § 6700 if it finds "that injunctive relief is appropriate to prevent recurrence of such conduct." Section 7408(b)(2). A typical injunction case involves consideration of the harm that would result if the order is or is not entered, the likelihood of the plaintiff prevailing on the merits, and the public interest at stake. *See, e.g., Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1138–9 (7th Cir. 1984). Congress' decision to attack abusive tax shelters with injunctions indicates that these factors have been taken into account legislatively. *United States v. Buttorff*, 563 F.Supp. 450, 455 (N.D.Tex.1983). Certainly, the public has an interest in the curtailment of abusive tax shelter programs, while a defendant in a § 7408 action can have no legitimate interest in continuing to sell interests in programs that are abusive. This will probably always be the case where the government seeks to enjoin someone to obey the law.

While few courts have had the opportunity to interpret these relatively new code provisions, those that have granted injunctive relief have based their decisions on findings that the defendants in those cases were likely to continue to violate § 6700 unless ordered to stop. *See Buttorff*, 563 F.Supp. at 455 (citing extended course of abusive conduct and defendant's fundamental opposition to the existing tax structure); *United States v. White*, 583 F.Supp. 1118, 1120 (D.Minn.1984).

As noted above, Symuel Smith's expertise, together with his continued activity in the energy management field, raise the reasonable likelihood that he will again venture into areas prohibited by § 6700, especially since scienter is not required under subsection (a)(2)(B). For that reason, this court will recommend that Judge Warren enjoin Mr. Smith from engaging in conduct that would subject him to liability under § 6700. There is no indication, though, that Monroe Swan has been involved in anything remotely like the Saxon venture since his departure from the North Farwell offices. This court does not believe that his "ability to sell himself and to motivate the public," as argued by the government, even when combined with his past participation in an abusive scheme, is sufficient to warrant an injunction. As noted above, a § 7408 injunction is essentially a court order that a defendant obey a law that he already has a general duty to obey. It is no more than a redundancy unless directed at those who pose some specific threat of future violation. The government simply has not proved that Mr. Swan fits this characterization.

26 U.S.C. § 7408(b) permits a court to enjoin a defendant from "engaging in such conduct [as is the basis for the injunction itself] or in an other activity subject to penalty under section 6700." The government's proposed order would enjoin the defendants from taking part in the Saxon program, and also from taking part in the sale of any tax shelter investment unless it is valued in a certain specified manner or employs a specific form of interest calculation, or if they know or have reason to know that it is unlikely to lead to profits. While the court is aware that injunctions should be set forth "in specific terms", Rule 65(d), Fed.R.Civ.P., it should be noted that none of the other courts that have issued § 7408 injunctions have felt the need to order defendants to affirmatively follow specified valuation or calculation procedures. *See, e.g., White,* 583 F.Supp. at 1121; *Buttorff,* 563 F.Supp. at 455–6; *United States v. Hutchinson,* 83–1 U.S.Tax Cas. (CCH) ¶ 9322, at p. 86,833

(S.D.Cal.1983). Furthermore, it does not seem proper for this court to place its imprimatur on certain valuation methods and appraisers, thereby excluding other equally appropriate methods or legitimate appraisers.

This court is of the view that it is only necessary to specifically enjoin defendant Smith *not* to become involved in the Saxon program or programs of a similar nature, and generally *not* to otherwise engage in conduct violative of 26 U.S.C. § 6700. By these proceedings, Mr. Smith will be on notice that any future ventures on his part should not involve overvaluations or the use of promissory notes payable only from insufficient sources of income. He should also be aware that false material statements knowingly made in the course of a sale of an investment interest could also violate § 6700 and the terms of the proposed injunction.

IT IS THEREFORE RECOMMENDED that Judge Warren enter orders to the following effect:

1. GRANTING the government's request for injunctive relief as against Symuel Smith.

2. DENYING the government's request for injunctive relief as against Monroe Swan, and dismissing the complaint against Mr. Swan.

IT IS FURTHER RECOMMENDED that Judge Warren enter an injunction against Symuel Smith in accordance with the form [Ed. Note: Judge Warren used the recommended form.]

Pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Local Rule 13.03, E.D.Wis., the parties shall have ten days from the date hereof to file written objections to the foregoing recommendation in duplicate with the Clerk of Court.