UNITED STATES of America, Plaintiff,

v.

MUSIC MASTERS, LTD, Masters Financial, Inc., Alfred R. Masters, John W. Olive, Robert F. Duncan, Ronald T. Dean, d/b/a Mass-Comm Enterprises, and David W. Mathes, d/b/a The Mathes Co., Defendants.

No. C–C–84–0228–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Nov. 12, 1985.

Charles R. Brewer, U.S. Atty., Charlotte, N.C., Alice Davis, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Larry Kars, New York City, Isham B. Bradley, Nashville, Tenn., for defendants.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on a Complaint filed by the Plaintiff against the Defendants alleging an abusive tax shelter scheme and seeking injunctive relief. The issues before the Court are: (1) whether Defendants violated 26 U.S.C. § 6700 proscribing abusive tax shelter schemes; and if so, (2) whether injunctive relief is appropriate under 26 U.S.C. §§ 7402 and 7408.

The trial was heard before the undersigned on September 25, 1985 in Charlotte, North Carolina. The Defendants were represented by Attorney Larry Kars. The Plaintiff was represented by United States Department of Justice Attorney Alice J. Davis. After a full trial of the matter, the Court, having carefully considered the testimony and exhibits, enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) Defendant Alfred R. Masters (hereinafter "Masters") is the President and 50% shareholder of the two defendant corporations, Music Masters, Ltd. (hereinafter "Music Masters") and Masters Financial, Inc. (hereinafter "Masters Financial"), both North Carolina corporations, with their principal place of business located in Charlotte, North Carolina.[1]

(2) In 1982 and 1983, Music Masters was engaged in the business of buying master sound recordings and leasing them to investors, in investment plans entitled "Music Masters Ltd., Master Sound Recording Lease Programs," (hereinafter the "investment programs"). Masters Financial mar-

keted the master sound recordings on behalf of Music Masters, and promoted the leasing programs to potential investors.

(3) A master sound recording (hereinafter "master") is a permanent tape made of a musical performance that can be reproduced onto other devices (records, tapes, etc.) for distribution and sale.

(4) Music Masters offered investors an opportunity to lease interests in these masters under various programs. In 1982 these were the "Regular," "TV Promotion" and "Single" programs; and in 1983 they were the "Headliners," "Regular," "Rising Stars," and "Music Video" programs.

(5) Under each of these programs, investors purchased one or more leasehold units in the master. Defendants represented to investors that each investor was to be in the business of manufacturing records and/or tapes from their leasehold interest in the masters, for the purpose of selling the records and/or tapes to the public for profit.

(6) In each of the master sound recording lease programs offered by the Defendants, Music Masters elected to transfer investment tax credits to the lessees, pursuant to Internal Revenue Code Sections 38 and 46–48.

(7) Defendants represented that each investor would be eligible to claim an investment tax credit based on the percentage of their investment in the master and the amount Music Masters purportedly paid for the master, including cash and notes. Defendants also represented that each investor would be eligible to claim business deductions for the amount paid for leasing and start up distribution expenses.

(8) Over 1,000 persons invested in the Tax Shelter in 1982 and 1983. The Internal

---

**1.** Masters, Music Masters and Masters Financial are the sole Defendants in this case. The other named Defendants have either settled with the Government or have been dismissed. Defendants John W. Olive and Ronald T. Dean each have consented to be enjoined, without admitting or denying any of the facts alleged in the Complaint, and Final Judgments of Permanent Injunction have been entered against them by

this Court. Defendant David W. Mathes was enjoined pursuant to a Court order issued by the United States District Court for the Middle District of Tennessee, and was therefore dismissed from this case. Defendant Robert F. Duncan was not served with process, and pursuant to Rule 4(j) of the Federal Rules of Civil Procedure, will be dismissed from this case.

Revenue Service claims that over $17 million in improper tax deductions and credits may be taken if each investor uses the deductions and credits that Defendants represented were made available to them by investing in the program.

(9) During 1982 and 1983, Music Masters purchased approximately 135 masters, paying for each partially in cash, and issuing a promissory note for the balance. Music Masters purchased the masters it leased from the following sources: Hice Music Corporation, Gold Shield Productions, Inc., Hal Kat Kountry Music, and Golden West Studios.

(10) During 1982 and 1983, Music Masters made down payments of approximately $1,242,200 in cash for masters it purchased and leased in its programs.

(11) During 1982 and 1983, Music Masters issued notes claimed to be recourse totalling approximately $112,963,900 for the masters it purchased and leased in its programs.

(a) Each of the notes issued by Music Masters was for a period of 12 years, with interest accruing at 9%, non-compounding, each year. Each note was secured only by the master for which it was issued, although each was alleged to be recourse against any and all assets of Music Masters.

(b) Payments on the notes before the 12-year due date were to be made solely out of profits generated from the sale of records, purportedly through the business efforts of the investors.

(12) Music Masters was to pay 45% of its profits on the notes. No other payments were required to be made by Music Masters during the 12-year life of the notes.

(13) Music Masters purchased the majority of its masters from Hice Music Company in Charlotte, and Gold Shield Productions, Inc., in Nashville, Tennessee (hereinafter, "Gold Shield").

(14) Hice Music Company (hereinafter "Hice") sold about 40 masters to Music Masters in 1982 and 1983, taking back notes from Music Masters in excess of $30 million.

(15) Nick Hice (hereinafter "Hice"), the owner of Hice Music Company, testified that he was interested in the notes as a form of insurance that he would receive the royalty payments due him from the record sales, and that he did not expect to be paid over $30 million if no records were sold.

(16) It is extremely doubtful that the notes Music Masters issued to Hice will be paid from the sales of the masters. If Music Masters was to pay Hice the agreed upon price of $1.55 per album, a typical master in the 1982 Regular program with a note of $990,000 would have to sell over 600,000 records just to pay the principal due. A sale of 500,000 records is a gold album in the music industry. At the end of 12 years, with interest of 9% each year, a typical master would have to sell over 1,250,000 records to pay off the principal and interest due on the note. A sale of over 1,000,000 records is a platinum album. Only a very small percentage of masters ever reach this amount in sales.

(17) None of the notes Music Masters issued in these programs are likely to be paid out of the sales from the masters. Gold Shield, which also took back several million dollars in notes from Music Masters, was apparently working very closely with Music Masters and in collusion with the Defendants.

(18) Long term notes issued in conjunction with the purchase of masters are not normal in the music industry. The life of a master is short, and the great majority of the masters do not sell for longer than six months before they are taken off the market. Regional wholesalers refuse to take records which have previously been on the market and did not sell.

(19) One of the largest selling records in the Music Masters program has produced no more than approximately $6,000 to Music Masters.

(20) The Defendants made material gross valuation overstatements with re-

spect to the masters they offered to investors.

(21) Defendants represented that the value of each master was supported by two appraisals. The unrefuted testimony of one of the appraisers, David Mathes, is that the amount of the "purchase price" of each master to be appraised was provided to him by Music Masters, and this price formed the basis for his determination of "fair market value."

(22) David Mathes also obtained two other appraisers (Ronald Dean and Robert Holmes) to do appraisals for Music Masters at their request, and they too provided appraisals based on the purchase price of the masters that was provided to them by Music Masters. The only other appraiser for Music Masters was Lawrence Broderick, who also provided appraisals for Mid-South Music Corporation in Nashville, Tennessee.

(23) Mr. Mathes, who also testified as an expert witness for the Defendants, defined fair market value in terms of the sales price between a willing buyer and willing seller, but he made no attempt to determine whether the price was reached through arm's-length negotiations, the price of other similar masters on the market, whether there was a recent previous sale of the same master. He stated that he would be unable to determine the fair market value of a master if he did not know, beforehand, a selling price, because it was purely negotiable.

(24) The method of appraisal used by all of Music Masters appraisers was the same method used in a similar abusive tax shelter, sold by Mid-South Music Corporation in Nashville, Tennessee. *United States v. Mid-South Music Corp., et al.,* Civil No. 3:84–0968 (M.D.Tenn., 1985). Mr. Mathes' testimony in that case was similar to that given in the instant action.

(25) Mathes thoroughly researched each master recording and the artist using all his books, periodicals, and other information contained in his library in confirming his appraisal.

(26) Mathes clearly stated his "Determinants of Value" in this appraisal report.

(27) Mathes believed that his appraisals were good when he made them and that they were good on the date of trial.

(28) Mathes did not agree with the appraisal reports and the criteria used by the Government's expert, Thomas Bonetti.

(29) Mathes believed his job was to research and confirm the fair market value of a master based upon what a willing buyer was to pay for it.

(30) Mathes testified that the fair market value for a $10,000 automobile could be $30,000 if that was the amount that a willing buyer and willing seller would exchange.

THE COURT: Let me ask this witness a couple of questions myself. On this fair market value, you were influenced, I take it, by the price which was given to you my Mr. Masters. Is that right—or somebody?

A. Mr. Olive (vice-president and secretary-treasurer of Music Masters and Masters Financial).

THE COURT: And all you did was say— if they say it's worth two million, you verify in your own mind it's worth two million. Is that right?

A. That is correct.

THE COURT: Now, suppose I had an automobile being sold for $10,000 by dealers and I came out to you and I said, "I'll let you have this automobile for $30,000," and you said, "Okay, I'll buy it for $30,000." Now, does that establish a price of fair market value?

A. If I'm the willing buyer, yes, sir.

THE COURT: Is that—that's what I thought you said. Okay. Let's recess for lunch.

(Trial Transcript at 116–117).

(31) The valuations furnished by Masters and confirmed by their appraisers as the fair market values provided an apparent basis for the gross overvaluations of the masters and were stated for the purpose of misrepresenting to investors and prospec-

tive investors the correct valuations of the masters.

(32) There existed overvaluations which were in an amount exceeding 200% of the correct valuation of the masters involved.

(33) The Government's expert witness, Tom Bonetti, has considerable experience in buying and selling masters, and in appraising the value of masters.

(34) Mr. Bonetti examined several of the masters offered in the Music Masters programs, and concluded that the correct value of these masters was but a small fraction of the stated purchase price, ranging from $1,000 to $45,000.

(35) Mr. Bonetti's opinion of the fair market value of the masters is based on potential profit to be derived from record sales. Some of the factors that were used by him to project record sales include: the popularity and previous success of the artist, whether similar or identical songs on the master are already on the market, the quality of the performances, whether the masters were what they purported to be, and the quality of the production.

(36) Substantial defects in the masters were pointed out by Mr. Bonetti in his review of the sample masters he was provided, including songs on the albums that were not made by the performers, selections that were merely "song demos" and were not recorded to be marketed, and albums that did not appear to be recorded by the claimed artist.

(37) Several of the masters that were obtained were claimed by Music Masters to have been purchased in 1982, but were not in fact purchased until 1983.

(38) Defendants represented to the investors who leased interests in these masters that the investment tax credits and business deductions would be available to them for the 1982 tax year.

(39) A close examination of the dates of the purchases of the masters, the dates on the leases and the dates of the appraisals shows that Music Masters often leased masters before they were appraised. Further, several of the masters were leased to investors before they were produced, and yet, Defendants represented to investors the claimed values of the masters.

(40) The values Defendants represented to investors on masters that were not yet produced were each eventually supported by appraisals in the same amount. The Defendants' appraisers did not appraise masters without listening to the masters first; yet, they did agree to either backdate or supply a date on the appraisal that was "as of" the purchase date.

(41) Many of the investors in the Music Masters program were audited by the Internal Revenue Service. Music Masters and Alfred Masters provided advice and assistance to these investors, by acting as Power of Attorney and otherwise representing to them that the tax deductions and credits they claimed on their tax returns were valid.

(42) As of April 1985, Music Masters continued to collect payments on leases from investors. As of September 1984, Music Masters continued to threaten investors by letters which stated that if their late payments were not made, the Internal Revenue Service would be informed.

(43) Alfred Masters has a bachelors degree and worked for 18 years as a stockbroker in California.

(44) Alfred Masters was involved in setting up the Music Masters leasing program, including preparation of the materials that would be used in the program and obtaining appraisers that would render values of the masters at around $1 million. It was Alfred Masters' idea to set up Masters Financial, whose purpose was to market the tax shelter program.

(45) Masters had primary responsibility for obtaining sales representatives for the Music Masters investment programs.

(46) Defendant Masters distributed to sales representatives the offering materials for the lease programs, listings of masters to be leased, the lease agreements, the manufacturing/distribution agreements and the investment tax credit pass through. He also explained to them how the lease

program worked, and gave them further instructions for getting lessees into the program.

(47) Even though Alfred Masters was away from the office the majority of the time, he was in daily contact with the office and was fully informed of its activities.

(48) In the summer of 1985, Alfred Masters sent out a letter to investors promoting a new program through another corporation that he formed, Masters International, offering to purchase and sell records made from the masters for the purpose of proving to the Internal Revenue Service that the investors are "still in the trade or business."

(49) In 1981, Alfred Masters and Masters Financial both marketed the Mid-South Music master recording tax shelter that was enjoined by the District Court in Nashville, Tennessee.

■ (50) The investment programs offered by Defendants in 1982 and 1983 are investment plans within the meaning of Section 6700 of the Internal Revenue Code.

■ (51) The values of the masters which Defendants stated to lessees in the investment programs are material within the meaning of Section 6700 of the Internal Revenue Code.

(52) Defendants were instrumental in determining the values of the masters, by providing the claimed value of the notes to the sellers of the masters and by providing the same amounts to the appraisers.

(53) The notes entered into by Music Masters for the purchase of the masters leased in its investment programs were not *bona fide*. Similarly, Defendants' appraisals were not independent, but were based on prearranged "values".

(54) The value of each master leased in Music Masters investment programs can be no more than the cash that was paid for each master, and therefore, each valuation represents an overvaluation of more than 200%.

## CONCLUSIONS OF LAW

(1) This Court has jurisdiction over this action and the parties, pursuant to Sections 1340 and 1345 of Title 28 of the United States Code and Sections 7402(a) and 7408(a) of the Internal Revenue Code of 1954, as amended (26 U.S.C.) (hereinafter the "Code").

(2) Section 7408 of the Code grants this Court the authority to enter an injunction upon finding that the Defendants have engaged in conduct subject to penalty under Section 6700 of the Code, and upon further finding that injunctive relief is appropriate to prevent a recurrence of such conduct.

(3) Section 6700 of the Code was enacted in the Tax Equity of Fiscal Responsibility Act of 1982 for the purpose of penalizing persons who organize and sell abusive tax shelter plans, in an attempt to curb the sale of such shelters. S.Rep. No. 97–494, 97th Cong., 2d Sess., 266 (1982), U.S.Code Cong. & Admin.News 1982, p. 781, 1014. Section 6700 provides, in pertinent part:

(A) Imposition of Penalty—Any person who—(1)(a) organizes (or assists in the organization of) . . .

(ii) any investment plan or arrangement, or . . .

(b) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter, shall pay a penalty . . .

(4) Section 6703 of the Code places on the United States the burden of proving that the Defendants have engaged in conduct subject to penalty under Section 6700.

■ (5) The Government bears the burden of proving by a preponderance all factual predicates for the imposition of penalty for the filing of a frivolous return under 26 U.S.C. §§ 6702, 6703. *Franklet v. United States,* 578 F.Supp. 1552, 1559 (N.D.Calif.1984).

■ (6) Section 7408 injunction cases are similar in nature to injunction cases brought by the Securities Exchange Commission to enjoin fraudulent securities practices. *See, e.g., United States v. Buttorff,* 761 F.2d 1056, 1062 (5th Cir.1985); S.Rep. No. 97–494, 97th Cong., 2d Sess. at 266, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 1014.

(7) The standard of the burden of proof used in the SEC injunction cases is the "preponderance of the evidence" standard, and this is the proper standard to be used in Section 7408 injunction cases. *See Steadman v. SEC,* 450 U.S. 91, 95, 101 S.Ct. 999, 1004, 67 L.Ed.2d 69 (1985) and *SEC v. C.M. Joiner Corp.,* 320 U.S. 344, 355, 64 S.Ct. 120, 125, 88 L.Ed. 88 (1943).

■ (8) The Music Masters Master, Ltd., Sound Recording Lease Program is an abusive tax shelter within the meaning of Section 6700 of the Code.

■ (9) Music Masters, Masters Financial and Alfred Masters each were involved in the organization of the tax shelter within the meaning of Section 6700, and each participated in the sale of interests in the tax shelter.

(10) Music Masters, Masters Financial and Alfred Masters each furnished statements as to the value of the master recordings that were leased to investors in the tax shelter, within the meaning of Section 6700, by preparing and furnishing the offering materials and otherwise providing advice to the investors.

■ (11) Each of the statements of value of the masters that were furnished by the Defendants are gross valuation overstatements within the meaning of Section 6700.

(a) Valuation is necessarily an approximation. It is not necessary that the value arrived at by the trial court be a figure as to which there is a specific testimony, if it is within the range of figures that may properly be deduced from the evidence. *See, e.g., Buffalo Tool & Die Mfg. Co., Inc. v. Commissioner,* 74 T.C. 441 (1971). Arm's-length sales are, other things being equal, the best evidence of the value of the assets of a business. *Gravois Planning Mill Co. v. Commissioner,* 299 F.2d 199 (8th Cir.1962); *Grill v. United States,* 303 F.2d 922, 157 Ct.Cl. 804 (1962). However, when peculiar circumstances tend to inflate the price at which property is sold, that price is not a proper measure of fair market value. *Flowers v. Commissioner,* 80 T.C. 914 (1983).

(b) The notes issued by Music Masters to purchase the masters were not *bona fide.* Although the notes are alleged to be recourse, requiring Music Masters to pay over $112 million plus 9% interest at the end of 12 years, the circumstances surrounding the issuance of these notes indicate that they were not entered into in *bona fide* arm's-length transactions, and there is little likelihood that they will be paid when they supposedly become due. Testimony of Nick Hice shows that only cash amounts to be received by him were negotiated, and that he expected to make his profits from the sale of records, not from the notes. He did not expect to be paid if records did not sell. The conclusion of invalidity of the notes is also supported by other factors. The notes were only recourse as to Music Masters, Ltd., not to the individuals. At the end of the 12 years, Music Masters could be defunct, with no assets. The high possibility of this is shown in the facts alleged in a Complaint filed by John Olive against Alfred Masters in state court proceedings alleging that he is wasting corporate assets and selling the assets of the corporation. *Olive, et al. v. Masters, et al.,* No. 85CVS–5272 (Superior Court, Mecklenburg County, filed April 29, 1985.) It is highly unlikely that there will be corporate assets for payment of these notes in 12 years, nor were there corporate

assets when the notes were taken by Hice or Gold Shield.

(c) The testimony of Defendants' expert, who was also one of Defendants' appraisers for the masters, indicates that neither he nor the other appriasers obtained by Defendants rendered independent appraisals of the masters' value. The definition most often used in tax cases to determine "fair market value" is "the price at which property would exchange hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor sell and both being *reasonably informed as to all relevant facts.*" (Emphasis added). *See Goldstein v. Commissioner*, 298 F.2d 562 (9th Cir.1962) and *O'Malley v. Ames*, 197 F.2d 256 (8th Cir. 1952). See also 10 Merten's Law of Federal Income taxation (1984 revised ed.), ¶ 59.01, et seq. While Defendants' appraisals were allegedly based on the definition, they were essentially based on the "prices" given to them by Music Masters, which were not based on arm's-length transactions, but were created by Music Masters for the tax shelter plan. Further, Mathes' testimony that he could not value a master if he was not first given a selling price casts a cloud over his credibility as an appraiser, since it is not necessary to have an actual sale in order to establish a market value. *See Gersten v. Commissioner*, 267 F.2d 195 (9th Cir.1959). Defendants' expert provided the same testimony concerning his method of appraisals in *United States v. Mid-South Music Corp., et al.*, Civil No. 3:84–0968 (M.D.Tenn., Sept. 20, 1985), a case very similar to the present one. In the *Mid-South* case, that Court determined that each of the masters was overvalued by more than 200%, and that the promissory notes were not *bona fide*.

(d) The testimony of the Government's witness provides convincing evidence that the masters are worth no more than the cash that was paid for them, as his appraisals also closely approximate the cash that was paid for the masters. His testimony concerning industry practices and the life of master recordings leads this Court to conclude that the tax shelter plan of the

Defendants was organized and promoted solely for the purpose of generating tax benefits for the investors without any real expectation of profit to be derived by the investors. This conclusion is further supported by the incredible number of records each master would have to sell in order for Music Masters to just "break even;" the fact that Defendants could have purchased masters directly from Paul Wyatt (who sold masters to Gold Shield) for a small fraction of the price they ultimately paid; and that Music Masters was able to "price" masters for the lessees before the masters were even produced.

■■■■ (12) Section 6700 does not require that the Defendants know or have reason to know that the gross valuation overstatements were made under subsection (a)(2)(B). *See U.S. v. Turner*, 601 F.Supp. 757, 767 (E.D.Wisc.1985). Thus, the furnishing of the gross valuation overstatements by each of the Defendants is conduct subject to penalty within the meaning of Section 6700.

■■■■ (13) Nevertheless, each of the Defendants also furnished false statements concerning the masters that they claimed to have purchased from Gold Shield in 1982, but were not in fact purchased by Gold Shield from Paul Wyatt, a sales broker of masters, until 1983. Under Section 46(c) of the Code, property must be placed in service in the year for which an investment tax credit is claimed. *Solon v. Commissioner*, 1980–77 T.C.Memo., *aff'd by unpublished order* (5th Cir.1981). Music Masters represented to investors that these masters were purchased in 1982 and that the investors could deduct the investment tax credits for that year. These were material false statements, since the availability of credits for the 1982 year would have a substantial impact on a reasonably prudent investor in the investment program. *See United States v. Buttorff*, 761 F.2d 1056 (5th Cir.1985).

(14) Each of the Defendants knew or had reason to know that the statements relating to the year these matters were pur-

chased were false, since the masters were not in the possession of Music Masters and could not possibly have been sent to the distributors. The facts show that Alfred Masters was integrally involved and kept close contact with the office and John Olive, even though he was out of the office a great deal of the time. His close involvement with office operations is clear evidence that he had reason to know of the false statements concerning the purchase dates of these masters.

■■■■■ (15) Each of the Defendants also made false statements to the investors within the meaning of Section 6700 concerning the availability of the deductions and credits to them by investing in this program, based on the following:

(a) In order for a taxpayer to claim an investment tax credit or a business expense on his or her income tax returns, such taxpayer must enter into the transaction with the intent of making a profit from the business. If no profit motive exists, the deductions will be disallowed. Where there is a lack of economic substance to the whole transaction, the transaction will be considered a sham for tax purposes and no deductions or credits will be allowed. *See e.g., Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir.1985); *Flowers v. Commissioner, supra.*

(b) The investors were each told they were to be in the business of manufacturing and distributing records based on the partial interest(s) they leased in the masters, and that they would not have to pay more than the start-up distribution expenses, which could be as little as $200. They were routinely not told who were the other investors in that master.

(c) The testimony of several witnesses provides clear evidence that it would be impossible for an investor with a partial interest to attempt to distribute an album, and that distribution in the 1982 Regular could not be obtained for the minimum payment of $200, or for $800 for a TV promotion.

(d) The Defendants each knew or had reason to know that the statements they furnished regarding the deductibility of the credits and business expenses were not allowable under the Code, as they organized and planned the transactions, and continued to represent to investors that their deductions and credits were allowable, after the Internal Revenue Service began auditing them.

(e) The availability of the deductions and credits to the investors is material within the meaning of Section 6700, in that this would impact on the decision-making process of a reasonably prudent investor. *See United States v. Buttorff, supra.*

■■■ (16) Defendants also represented that they were not to be a party to the agreements between the lessees and the distributors, and that the lessees themselves were to engage in the business of distributing the masters. But the Defendants were actively involved in obtaining distributors for the masters, were involved in trying to get the records on the market, and routinely changed either masters or distributors of the lessees without first notifying the lessees. The evidence is clear that Defendants carried on the business of manufacturing and distributing the masters. The Defendants' representations to the contrary are false and/or fraudulent. These representations are material matters within the meaning of Section 6700, because Music Masters' involvement in the business activities that were alleged to be the business of the investors might cause the lease arrangements to be reclassified by the Internal Revenue Service, thereby threatening the investors' ability to claim the investment tax credits that were passed through to them by Music Masters. *See, e.g., Comidsco, Inc. v. United States*, 53 A.F.T.R.2d 84–333 (D.Ill.1983); *See also Jackson v. Commissioner*, T.C.Memo 1982—556.

■■■ (17) Injunctive relief is appropriate to prevent each of the Defendants from engaging in further conduct subject to penalty under Section 6700 of the Code. The United States seeks to prevent the Defend-

ants from continuing to represent to investors that the tax deductions and credits they claimed are valid, among other things. Alfred Masters' background in the securities business and the fact that he was one of the originators of this Music Masters' tax shelter plan; his history of promoting the Mid-South Music plan; his continued representations to investors concerning the validity of their tax deductions after audit and after the institution of this law suit, and his marketing of a new plan in 1985 to buy and sell the records of the lessees for the purpose of proving to the Internal Revenue Service that they are "still in a trade or business," all indicate that he has no intention to cease the activities complained of in this case. Where there is no indication that an individual will attempt to comply with the law, injunctive relief has been determined to be appropriate. *See, e.g. United States v. Buttorff,* 761 F.2d 1056 (5th Cir.1985); *United States v. White,* 769 F.2d 511 (8th Cir.1985); and *United States v. Mid-South Music Corp., et al., supra.* Since he acts through the two Defendant corporations, injunctive relief is appropriate as to each of them also.

(18) Injunctive relief is also appropriate because of the public interest in preventing the Defendants from making further representations concerning the validity of the deductions and credits taken by the investors in the Music Masters program on their income tax return. *See, e.g. United States v. Buttorff, supra.* Over 1,000 persons invested in this program in 1982 and 1983. The Internal Revenue Service estimates that if each person claimed the deductions and credits alleged by the Defendants to be available to them, improper tax claims of over $17 million will be claimed. This loss to the public fiscal will be increased by the cost of auditing and litigating these cases, in the event that the investors contest the audits. Music Masters continued representations to the investors that they should not settle their cases with the Internal Revenue Service, and that the master values as stated by them are correct, should be enjoined. The history of Defendants' continued sales activities, the continued allega-

tions that the tax deductions are or somehow can be made legitimate, the harm to the public and the harm to the Government are all reasons that show why injunctive relief is appropriate to prevent Defendants from further sales activities of abusive tax shelters such as the present one, and from making representations to investors that the tax shelter is legitimate.

■■■ (19) Defendants' conduct is also enjoinable under Section 7402(a) of the Internal Revenue Code.

(a) Section 7402(a) of the Internal Revenue Code gives the district courts of the United States the jurisdiction "to make and issue in civil actions, writs and orders of injunction ... and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws."

(b) This Court has jurisdiction to grant an injunction under Section 7402(a). *See, United States v. Savoie,* 594 F.Supp. 678 (W.D.La.1984); *United States v. May,* 555 F.Supp. 1008 (E.D. Mich.1983) and *United States v. Landsberger,* 692 F.2d 501 (8th Cir. 1982).

(c) Defendants have interfered with the proper enforcement of the Internal Revenue laws by continuing to represent to investors that the deductions and credits attributable to the Music Masters' tax shelter plan are allowable under the Internal Revenue Code, and by continuing to urge investors to not settle their cases with the Internal Revenue Service. Defendant Masters has also created a new plan through his corporation, Masters International, and has represented to investors that this new plan may somehow legitimize the deductions they took that are clearly disallowable. Thus, injunctive relief to prevent further activities such as these is appropriate and necessary under Section 7402(a) of the Internal Revenue Code.

(20) Once all of the facts have been proven showing a violation of Section 6700 of the Code and showing that injunctive relief is appropriate, this Court is authorized, as a matter of law, to issue an appropriate injunction order. Traditional equity grounds need not be proven in order for an injunction that is authorized by statute to be issued. *United States v. White, supra; United States v. Buttorff,* 761 F.2d at 1059; *Donovan v. Brown Equipment & Service Tools, Inc.,* 666 F.2d 148 (5th Cir. 1982); *Cf. United States v. Landsberger,* 692 F.2d 501 (8th Cir.1982).

(21) However, under the terms of Section 7408 of the Code and the facts of this case, the traditional equity grounds for obtaining an injunction have, indeed, been met. It is clear from the facts of this case that the United States will suffer irreparable injury if an injunction is not granted, and, that it has no adequate remedy at law. The threatened injury is further depletion of Government resources in locating and auditing taxpayers who may claim improper deductions and credits based on their investment in the Music Masters plan. Those who follow the advise of the Defendants may proceed to litigate their claims that the deductions are legitimate. As stated in another, similar injunction case under Section 7408 of the Code, "... actions against those following [the Defendants'] plans would entangle the Government in a maze of lawsuits." *United States v. Savoie,* 594 F.Supp. 678 (W.D.La. 1984). Injunctive relief is therefore both appropriate and necessary under Section 7402(a) of the Code.

(22) Any finding of fact which is determined also to be a conclusion of law is so deemed and any conclusion of law which is determined also to be a finding of fact is so deemed.

Based on the foregoing Findings of Fact and Conclusions of Law, the Court will enter Final Judgment of Permanent Injunction as to Alfred R. Masters, Music Masters, Ltd., and Masters Financial, Inc. simultaneously with this Memorandum of Decision.

## FINAL JUDGMENT OF PERMANENT INJUNCTION AS TO ALFRED R. MASTERS, MUSIC MASTERS, LTD., AND MASTERS FINANCIAL, INC.

Based upon consideration of all of the evidence presented at trial, upon the pleadings and the Findings of Fact and Conclusions of Law found by this Court, having found that Defendants have engaged in conduct subject to penalty under Internal Revenue Code Section 6700 and that injunctive relief is appropriate to prevent a recurrence of such conduct, IT IS, HEREBY, ORDERED, ADJUDGED, AND DECREED:

(1) That Defendants Alfred Masters, Masters Financial, Inc., and Music Masters, Ltd., their officers, agents, attorneys, servants, employees and all those in active concert or participation with them, and each of them, are hereby permanently enjoined and restrained from directly or indirectly, by the use of any means or instrumentalities:

A. Taking any action in furtherance of the organization, promotion, advertising, marketing, or selling of the Music Masters, Ltd. Master Sound Recording Lease Program (hereinafter "Tax Shelter");

B. Representing that an investor in the Tax Shelter is entitled to Federal income tax deductions or credits, with respect to the Tax Shelter property (including investment tax credits and/or deductions for lease payments and distribution expenses), and from furnishing or distributing any oral or written information that so indicates;

C. Organizing or assisting in the organization of, or selling or leasing or participating in the sale or lease of interests in any "tax shelter" as defined in paragraph 3, *infra,* unless a complete appraisal using comparable sales and/or other methods of valuation commonly recognized in the trade has been obtained from an appraiser who is certified by the American Socie-

ty of Appraisers, or who has similar professional credentials;

D. Organizing or assisting in the organization of, or participating in the sale of any interests in a partnership or other entity, an investment plan or arrangement or any other plan or arrangement, in which the Defendants make or furnish, in connection with such organization or sale:

(a) a statement with respect to the allowability of any deductions or credits, the excludability of any income, or the securing of any other tax benefits by reason of holding an interest in the entity or participating in the plan or arrangement, which the Defendants know or have reason to know is false or fraudulent as to any material matter, or

(b) a gross valuation overstatement as to any material matter. A "gross valuation overstatement" means any statement as to the value of any property or services if the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and if the value directly relates to the amount of a deduction or credit for Federal income tax purposes.

(2) That for a period of five (5) years from date of entry of this Judgment, if Defendants acting individually or through any agent, servant, employee, corporation or other entity now in existence or hereafter formed, or indirectly in any other manner, intend to organize, assist in the organization of, or participate in the sale or lease of any tax shelter as defined in paragraph 3 below, they each shall:

A. Notify the Internal Revenue Service (through the District Director of the Internal Revenue District wherein he resides) of the intent to participate in the organization or sale of such tax shelter;

B. Provide the District Director with complete and true copies of all offering documents, appraisals, tax opinions, and other promotional material with respect to such tax shelter;

C. Wait a period of thirty (30) days from the date such material is delivered to the District Director before beginning the promotion and sale of such tax shelter; and

D. Refrain from making any claim or statement that such notification implies approval of the shelter by the Internal Revenue Service, or that any action or nonaction by the Internal Revenue Service as the result of such notification implies approval of the shelter by the Internal Revenue Service.

E. Prominently disclose the existence and nature of this Judgment in any and all materials or media used to offer for sale such tax shelter.

(3) A "tax shelter" as the term is used in paragraphs 1 and 2 of this Final Judgment is an investment which has as a significant feature for federal income or excise tax purposes either of the following attributes: (1) deductions in excess of income from the investment being available in any year to reduce income from other sources in that year, or (2) credits in excess of the tax attributable to the income from the investment being available in any year to offset taxes on income from other sources in that year.

(4) That Defendant Music Masters shall send a copy of this Judgment to each lessee in its 1982 and 1983 Master Sound Recording Lease Programs. Defendant Alfred R. Masters shall file an affidavit with this Court, within thirty (30) days from the date this Judgment is entered, affirming that a copy of this Judgment has been sent to each such lessee.

(5) That Defendant Music Masters shall send a letter to each lessee in its 1982 and 1983 Master Sound Recording Lease Programs offering to rescind the lease agreements Music Masters entered into with each such lessee within 30 days from the date this Judgment is entered. Music Masters shall file a copy of this letter with this Court

thirty (30) days from the date this Judgment is entered.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this action to implement and enforce this Final Judgment and all additional decrees and orders necessary and appropriate to the public interests. The provisions of paragraph 2 shall be in effect for a term of five (5) years from the date entered, unless the United States files a notice no earlier than 180 days nor less than 60 days before expiration, stating reasons why the best interest of the United States requires an extension of these provisions. In such case, the Court may extend these provisions in accordance with the public interest.

The Clerk is directed to file this Final Judgment simultaneously with this Court's Memorandum of Decision.