AMERICAN TECHNOLOGY RESOURCES, Albert S. Pitts, James A. Pitts and Thomas M. Pitts

v.

UNITED STATES of America.

Civ. A. No. 86–5769.

United States District Court, E.D. Pennsylvania.

March 29, 1989.

Howard Philip Newman, Wyncote, Pa., for plaintiffs.

Noreene C. Stehlik, Office of Special Litigation, Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION UNDER FED.R.CIV.P. 52(a)

LUDWIG, District Judge.

In 1986, the Internal Revenue Service assessed penalties against plaintiffs American Technology Resources, Albert S. Pitts, James A. Pitts, and Thomas M. Pitts for promoting abusive tax shelters as to tax years 1982 and 1983. 26 U.S.C. § 6700. Pursuant to 26 U.S.C. § 6703(c), plaintiffs, having paid 15 percent of the penalties, filed this action contesting their liability.[1] Jurisdiction exists under 28 U.S.C. §§ 1340 and 1346(a)(1).

### I.

The following statement of facts is based on the parties' extensive pretrial stipulation.

Plaintiff American Technology Resources (ATR) is a Nevada corporation, incorporated in 1982, with its principal place of business in Media, Pennsylvania. On June 1, 1983 its stock was issued to plaintiff Albert Pitts and his sons, plaintiffs James Pitts and Thomas Pitts. As of 1987 they owned 77.5 percent of the issued and outstanding shares. The other shareholders have not been active in the operation of the corporation.

Albert Pitts became president of ATR in 1982 succeeding Rolph Fuhrman.[2] United States Motion Picture Institute (USMPI) is a non-profit Nevada corporation, and since 1982 Rolph Fuhrman has been its president. ATR Financial, also a Nevada corporation incorporated in 1982, became wholly owned by ATR in 1983. In 1982, Fuhrman was its president. ATR Product Marketing

is a sole proprietorship of Albert Pitts, formed by him in 1982.

ATR produces and sells an "ATR Video Image System," which includes high-technology video-image storage and retrieval products, services and equipment. On November 15, 1982 it entered into an agreement with USMPI permitting USMPI to sell ATR territorial distributorships. In 1982 and 1983, 34 such distributorships were sold pursuant to agreements signed by representatives of ATR and USMPI and by the distributor. Each agreement granted the distributor the exclusive right to market the ATR system—"product"—within a designated territory in New Jersey, eastern Pennsylvania, or Delaware for a term of 43 years. These distributorships were sold to 32 individuals and two limited partnerships, ATR Philadelphia and ATR Delaware. Each distributor also entered into a "Consulting Agreement" with ATR Product Marketing, under the terms of which ATR Product Marketing manages, administers, and supervises the sale, lease and licensing of the ATR product for the distributor.

In return for the right to market the ATR product, each individual distributor agreed to incur a liability called a "Contingent Principal Sum," due USMPI in 23 installments: An "Incurred Annual Contingent Amount" equal to 20 percent of the "Contingent Principal Sum" payable in each of years one, two and three; no amount in years four through 10; and two percent of the "Contingent Principal Sum" for 20 years thereafter. The "Contingent Principal Sum" varied, depending on the population of the distributorship's territory.

Most of the distributors also paid to ATR Financial in each of the first three years a "Guaranteed Performance Deposit" equaling five percent of the "Contingent Principal Sum." These payments were not credited against the "Contingent Principal Sum." They were the only specific cash

---

1. A refund of the penalty amounts paid is also sought. The penalties assessed were as follows: American Technology Resources—$194,425; Albert Pitts—$6,000; Thomas Pitts—$8,000; James Pitts—$4,000.

2. Although not a part of the pretrial stipulation, these facts are uncontested.

payments a distributor was required to make.

Each individual distributor received a promotional package before signing the distributorship agreement. According to the promotional material, a distributor could elect to be personally "at risk" for all or a part of the 20 percent "Incurred Annual Contingent Amounts" due in years one, two, and three. This personal obligation became due in 20 years as reduced by the distributor's allocation of profits from sales of ATR product. The promotional material also represented that a distributor could deduct on his federal income tax returns the amount of the "Incurred Annual Contingent Amount" for which he assumed personal liability. A distributor could thereby obtain a federal income tax deduction of up to four times the payment to ATR Financial.

Under the agreement between ATR and USMPI, USMPI was to retain 25 percent of the "Contingent Principal Sum" payments and was to lend the balance, of 75 percent, to ATR without interest for an indefinite term. In 1982 and 1983, USMPI did not receive any payment on account of a "Contingent Principal Sum." Effective March 1, 1984, ATR, USMPI, ATR Product Marketing, and most of the distributors entered into a "Profit–Sharing and Joint Management Agreement." Under this agreement, all net profits or losses from ATR product sales made within New Jersey, eastern Pennsylvania and Delaware were to be divided among the distributors in proportion to the distributors' payments.

The following elections of personal liability by distributors and financial activities on the part of ATR occurred during the years shown:

In 1982, the distributors, including limited partners, chose to be "at risk" for $2,895,000. They received no distributions from ATR.

In 1983, the "at risk" amount was $4,235,000, with no distributions from ATR.

In 1984, the "at risk" amount was, again, $4,235,000. Distributions from ATR were $12,081, and the "Contingent Principal Sum" due USMPI was reduced by $4,066.

In 1985, the "at risk" amount was $1,340,000. ATR distributions were $24,448 with a reduction of the "Contingent Principal Sum" due USMPI of $29,744.

In 1986, the ATR distribution was $23,753 and the reduction of the "Contingent Principal Sum" was $59,113.

ATR and USMPI also entered into an "Agreement re Modification of Rights ..." under which ATR Product Marketing created an escrow fund that reduced the "Contingent Principal Sums" due USMPI. This fund was used to pay plaintiffs' legal fees and those of a number of distributors in tax litigation arising from the "ATR Territorial Distributorship Program." As of July, 1987 $123,000 was paid into the fund.

According to ATR's promotional material issued in 1982, a sale of one video disk system for $88,000 in a "minimum" territory—a population of 50,000 and a "Contingent Principal Sum" of $200,000—would cost ATR $50,000 and the distributor would receive $9,900. All sales outside designated territories would be credited solely to ATR. Thereafter, 55 to 60 percent of sales, in dollar amounts, took place outside the distributorship territories. In 1982, ATR's only sale of its product was one video disk player to ATR Product Marketing. In 1983, the only sale was one such player to an advertising agency that was retained by ATR.

In 1982, Albert Pitts was a paid consultant for ATR while its program was being organized and before any distributorships were sold. Since May, 1983 he has been signing checks for ATR Financial, which paid commissions on sales of ATR distributorships. ATR owns no patents. Until 1983, Albert Pitts sold mutual funds and tax-advantaged investments and his sons worked with him. He provided the ATR promotional package and, in 1982 and 1983, explained the ATR program to a number of purchasers of distributorships. In this period, he also trained his sons and others to enable them to sell distributorships. James Pitts presented the ATR program to members of the financial community and gave out the ATR promotional package and

private placement memorandums for the limited partnerships. Thomas Pitts did the same with purchasers of the distributorships.

The ATR promotional package of 1982 for individual distributors contained the following items:

(a) a cover sheet with table of contents consisting of two pages;

(b) "Overview" consisting of six pages;

(c) a letter dated July 15, 1982 from Rolph Fuhrman as president of USMPI;

(d) a letter dated July 15, 1982 from Nemecek, Gonzalez & Linsley;

(e) a tax opinion letter dated July 15, 1982 and addressed to USMPI consisting of 18 pages;

(f) "Territorial Distributorship Agreement" consisting of six pages;

(g) a receipt for payment to sales representative;

(h) a package entitled "tax forms" consisting of three pages, including a copy of Form 5213 entitled "Election to Postpone Determination with Respect to the Presumption that an Activity is Engaged in for Profit" and a copy of Schedule C—"Profit (or Loss) from Business or Profession";

(i) a form entitled "Consulting Agreement."

The contents of the promotional package in 1983 for individual distributors were the same as the 1982 package excepting a cover sheet with a table of contents and a tax opinion letter dated August 29, 1983 from another law firm in place of the tax opinion letter dated July 15, 1982. As to the two limited partnerships, each limited partner received a private placement memorandum, containing, among other items, a summary of the offering and the tax opinion letter of July 15, 1982.

The ATR promotional package states that "the total purchase price of each Territorial Distributorship consists of a 'Contingent Principal Sum' that is payable in a series of Incurred Annual Contingent Amounts." The "Contingent Principal Sum" for each territory was determined by multiplying the population by 10 cents per person times 40 years. This formula was not subject to change or negotiation. Before the present lawsuit, Albert Pitts did not retain anyone to perform a market appraisal of any territory and was not aware of such an appraisal.

Executive Design Investments, Inc., a Pennsylvania corporation, formed in 1973, is owned by Albert Pitts and his sons. It received from ATR Financial a commission on each limited partnership unit and ATR distributorship it sold. Albert Pitts, James Pitts and Thomas Pitts sold limited partnerships and distributorships through this corporation. Another corporation, EDI Inc., is a Nevada corporation incorporated in 1982.[3] It was authorized in 1982 by ATR to form limited partnerships for sales territories in Philadelphia and Delaware, and it became the general partner in those partnerships. It did not maintain any books of account as general partner for either partnership.

Albert Pitts is a limited partner in ATR Philadelphia and, as such, was required to pay $18,000 for his units. He did not make any payment toward this subscription price. The limited partners in both partnerships were required to pay $3,000 per unit of which the partnership was to retain $2,700 and $300 was sales commission. Each partnership paid ATR Financial the full "Guaranteed Performance Deposit."

Albert Pitts also acquired an individual distributorship. He did not pay the "Guaranteed Performance Deposit" of $5,000 per year during the first three years of ownership.

From 1982 to 1985, ATR and ATR Financial received $2,138,825 from the sale of distributorships. In 1982 and 1983, Albert Pitts received from ATR Financial $48,800 in sales commissions and $36,170 in consulting fees and also received commissions from Executive Design Investments, Inc. In those years, this corporation received from ATR Financial $113,850 in sales commissions and $120,933 in consulting fees.

**3.** EDI, Inc. and Executive Design Investments, Inc. are two separate corporations.

In 1982 and 1983, James Pitts received from ATR Financial $3,000 in sales commissions, $3,000 in consulting fees, a draw of $3,600, and an advance of $6,000. In 1983, he also received from Executive Design Investments, Inc. $34,867 for sales of distributorships.

In 1982 and 1983, Thomas Pitts received from ATR Financial $13,800 in sales commissions. In 1983, he received from Executive Design Investments, Inc. $41,165 for sales of distributorships.

## II.

The following fact findings are based on the evidence:

ATR's marketing business involves the "interactive video disk"—using laser technology to store and display images, much in the way that compact disks relate to sound. Advantages over video cassettes are random access to any place on the disk and a nearly unlimited disk life. Movies and games, as well as instructional material, can be shown. In 1982 and 1983, most of the market was limited to employee training. Production at an acceptable price has been a problem, but widespread consumer manufacturing and distribution may occur shortly. ATR began as a dealer in the "gray market of excess arcade game inventory." Tr. 60, Oct. 10, 1987. Albert Pitts made a secondary market in video disk equipment by buying and selling overruns and liquidations of outdated merchandise at discount. He became known as a source of hard-to-find, out-of-stock items. ATR has no exclusive arrangements with manufacturers or distributors. It continues to be in business, although its sales volume to 1987 was marginal.

Albert Pitts had no formal education or experience in engineering or computer science. He first learned about video disk technology in 1982, in connection with the ATR program.

Investors in ATR distributorships or the limited partnerships were solicited by unqualified claims of income tax advantages. A chart included in the promotional packages showed cash requirements of $30,000 and tax write-offs of $200,000. The description of the video disk business was brief, three pages, and vague—for example, no projections of income from sales. The explanation of the tax incentives, some 24 pages, together with a tax opinion letter and federal income tax forms, occupied most of the promotional material. Also, it was represented:

> In the event any portion of the projected tax benefit is denied by the Internal Revenue Service, the Territorial Distributor will be guaranteed *at no additional cost* (except for filing fees) competent legal services for representation in the United States Tax Court and the United States Circuit Court of Appeals. (Emphasis in original.)

Most of the distributorship agreements were signed for ATR by one of the plaintiffs, and they also acted for one general partner, EDI, in entering into the sales of limited partnership units. Although the distributors had the right to make sales within their territories, all of them executed agreements with ATR Product Marketing to take over the operations of the distributorships. Through this arrangement, Albert Pitts, the owner of ATR Product Marketing, retained control of all the distributorships. Excepting the possibility of business contacts, the distributors, as a result, were passive investors. They obtained an immediate and substantial tax deduction and, inferentially, relied on the distributorships to pay off the personal obligations that they had assumed.

In turn, Albert Pitts' concern was the distributors' ability to pay the "Guaranteed Performance Deposit"—not the "Contingent Principal Sum" or the "Incurred Annual Contingent Amount." These latter obligations were owed to USMPI, the nonprofit corporation, not to Pitts or ATR. As of 1987, the total outstanding "Incurred Annual Contingent Amount" was about $12 million. The only evidence of a distributor's ability to pay was a certification in the distributorship agreement of net worth in excess of $1 million. No credit check or other investigation was made. According to Albert Pitts, no credit report was needed because the distributors were known to

him to be persons of substantial means. He could not explain why the ATR agreement contained the net worth certification when the "at risk" obligation did not extend to ATR.

The ATR distributorship became a 4–to–1 tax shelter through a combination of the "at risk" tax rules [4] and the election of the accrual method of accounting. For example: An investor acquired a territory with a "Contingent Principal Sum" of $200,000. In 1982, the investor incurred $40,000 in "Incurred Annual Contingent Amount" and elected to be "at risk" for that sum. Under the accrual method, an income deduction of $40,000 was claimed. The cash outlay, however, was the $10,000 Guaranteed Performance Deposit. The same tax events occurred in 1983 and 1984. At that point, the investor had purportedly incurred and deducted $120,000 in obligations, which translates into a $60,000 tax reduction for a taxpayer who was in the 50 percent tax bracket. *See* defendant's exhibit 18b.

According to the distributorship agreement, the price of a distributorship was its "Contingent Principal Sum." This amount was the value of the distributorship as stated or as represented to the investor. The total for the distributorships was $20 million. Other than the "Guaranteed Performance Deposit" it does not appear that these personal obligations were intended to be paid or enforced. The accurate or correct valuation of the distributorship, using a fair market value formula, did not exceed $1 million. In other words, the stated value exceeded the correct valuation by at least 20 times, or 2,000 percent.

This finding as to the correct valuation of the distributorship is supported by the opinion of the government's expert, Professor Jeffrey Jaffe of the Wharton School of Finance. As he explained, the only reason for someone to invest in ATR was the large tax deductions available. Using a fair market value approach of the willing and knowledgeable seller and buyer, the aggregate value of the distributorships during 1982 and 1983 was between zero and $1

million. For this period, the discounted cash flow, or capitalization, valuation method would be unrealistic because there were no reliable projections of future earnings for the video disk industry in general or for ATR in particular. In 1982, this was a fledgling industry with high, indeterminate risks. The inability to project income is significant because it rules out the distributorships as realistic business investments. ATR had no prospectus, no researched, logical plan. Knowledgeable investors would be unwilling to put money into such a speculative, undefined, long-term venture on the strength of its economic potential. As Albert Pitts admitted, ATR could not raise working capital through conventional sources. From the standpoint of its investors, ATR's business prospects were incidental, the tax incentives, primary.

Another measure of value, as given by Professor Jaffe, is comparative data, using other high technology businesses that were starting up at about the same time. In 1983, Sequent Corporation, a computer company, obtained $5 million in venture capital. In 1982–1985, ATR received $2.7 million from its investors in the form of "Guaranteed Performance Deposits." Sequent was a far better investment. It was formed by high-ranking former employees of Intel, a computer company, executives who had proven track records, a detailed business plan, and the experience and skills necessary to take over a successful new business. Albert Pitts and his sons lacked this type of background. Also, in 1983, the video disk industry was much less developed than the computer industry—and remains so.

As Professor Jaffe further analyzed, the most that usually can be generated in venture capital for a new, unknown company is about $1 million. Sequent's achievement was remarkable. Venture investors fund perhaps two percent of the opportunities offered to them. If ATR distributorships had not been presented as tax advantaged, it is unlikely that there would have been

---

4. 26 U.S.C. § 465.

any investors. These factors account for a range of value from zero to $1 million.

Other specific items that investors would consider are that Albert Pitts did not put any capital in ATR.[5] Under the "Joint Management and Profit Sharing Agreement," the distributors would not receive any share of the profits from sales outside Pennsylvania–New Jersey–Delaware. ATR had no hard business advantages, such as patents or exclusive sales arrangements with manufacturers or others. It had no sales organization or structure. In short, it was an embryonic, almost formless enterprise with at most three managers who had no expertise. Likewise, the industry was immature and unpredictable.

Jaffe valued the distributorships in the aggregate and did not place a value on each territory. The economic premise of the "Joint Management and Profit Sharing Agreement" is that for the purpose of allocating profits from sales, the territories are fungible. It is immaterial where in the territories the sales occur.

As Jaffe and plaintiffs' expert, Rockley Miller, publisher of a video disk trade magazine, agreed, projections for the industry were highly variable in 1982 and 1983. Some were optimistic, predicting strong growth. Others were negative. Some large manufacturers were leaving the market, having sustained substantial losses. Estimates consistently outran actual sales. The consumer market was tiny, and there were technological and sales barriers to its entry. In 1982 and 1983, ATR did not have five percent of the distribution of consumer disk equipment. It could not be compared with the developed network of distributors of consumer electronics, chain stores, and other well known outlets.

The ATR distributorships did not have a value equivalent to their "Contingent Principal Sums" inasmuch as the projections showing enough income to pay those amounts are pure speculation and have no factual foundation. As Albert Pitts admitted, in 1982 when he was selling the distrib-

utorships, these projections had not been made. Even if the distributorships in the aggregate were worth the actual amount paid for them, $2.7 million, they were grossly overvalued, considering the total "Contingent Principal Sums" of $20 million.

The tax deductions claimed by the investors amounted to 60 percent of the stated value of the distributorships—$12 million—since that was the figure that was accrued and "at risk."

### III.

The Internal Revenue Code, 26 U.S.C. § 6700, provides:

(a) Any person who—

(1)(A) organizes (or assists in the organization of)— ...

   (iii) any ... plan or arrangement or

(B) participates in the sale of any interest in an entity or plan or arrangement ... and ...

(2) makes or furnishes ...

(B) a gross valuation overstatement as to any material matter,

   shall pay a penalty equal to the greater of $1,000 or 20 percent of the gross income derived or to be derived by such person from such activity.

Under § 6700(b), "gross valuation overstatement" is:

any statement as to the value of property or services if—

(A) the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and

(B) the value of such property or services is directly related to the amount of any deduction or credit allowable under chapter 1 to any participant.

The government must prove by a preponderance of the evidence all facts predicate to the imposition of the penalty. 26 U.S.C. § 6703(a). *Franklet v. United States,* 578 F.Supp. 1552, 1559 (N.D.Cal.1984), *aff'd* 761 F.2d 529 (9th Cir.1985); *United States v. Music Masters,* 621 F.Supp. 1046, 1054 (W.D.N.C.1985).

---

**5.** Although he testified that he did invest in the business, the evidence discloses that he lent ATR some $50,000, which was largely paid back. He admitted he did not pay for his limited partnership subscriptions or the "Guaranteed Performance Deposit" for his territory.

### A. Organizing and Participating in the Sale of a Plan

■ In this case, the "plan or arrangement" constituting the tax shelter is the territorial distributorship program. Individual plaintiffs concede that they participated in the organization and sale of the program. Under the evidence each was intimately involved with the sale of distributorships and partnership units. They acted as representatives of the companies and were compensated by fees and commissions.

ATR argues that it did not organize or assist in the organization of or participate in the sale of a plan within the meaning of the statute. Its position is that it "did not participate other than by being sold." However, what was sold were distributorships, not the ATR corporation, and the undisputed evidence shows that ATR was actively involved in organizing and selling the distributorship program. ATR granted USMPI the right to market ATR distributorships, hired marketing consultants, and requested a legal opinion regarding registration of the sale of distributorships under the Securities Act of 1933. The distributorships were sold in the name of ATR, and representatives of ATR signed the distributorship agreements. As noted, ATR set up and controlled a legal defense fund for participants in the program. Given these facts, ATR was a "person who organizes" and "participates in the sale of a plan" under § 6700(a)(1).

### B. Gross Valuation Overstatement

Under the statutory definition to be applied here, a gross valuation overstatement consists of a statement of the value of the territorial distributorships that "exceeds 200 percent of the amount determined to be the correct valuation," and that "value ... must be directly related to any deduction" ... "allowable" to the distributor. Both § 6700 requirements are met. *See United States v. Turner*, 601 F.Supp. 757, 766–67 (E.D.Wis.1985).[6]

**6.** There are few reported decisions construing § 6700 and there appear to be none involving

### 1. Statement of Value

■ Plaintiffs' claim that they did not make a "statement as to the value" of the distributorships within § 6700(b)(1) is without merit. The ATR document package, supplied to each investor, states: "The total purchase price of each Territorial Distributorship consists of a Contingent Principal Sum...." This amount was placed in the appropriate blank in the territorial distributorship agreement after the distributor chose a territory. A person who puts a purchase price on an asset may be considered to have made a representation as to its value. *See United States v. United Energy Corp.*, 1987 U.S. Tax Cas. (CCH) ¶ 9216, at 87,367, 1987 WL 4787 (N.D.Cal. 1987).

Plaintiffs cannot readily argue that the statement of the distributorship's price was not a statement of value. In legislating § 6700, Congress was concerned with the "widespread marketing and use of tax shelters undermin[ing] confidence in the fairness of the tax system and in the effectiveness of existing enforcement provisions." S.Rep. No. 494, 97th Cong., 2d Sess. 266, *reprinted in* 2 1982 U.S.Code Cong. & Admin.News 781, 1014. Word games were anticipated. According to the legislative history, the seller of a tax shelter is to be held liable for a gross valuation overstatement "whether or not the accuracy of the statement of valuation is disclaimed." *Id.* at 1015. Drafted broadly, § 6700 speaks of "any statement as to the value of property or services." Within the terms and context of this tax provision, plaintiffs made a "statement of value" by executing the distributorship agreements. Defendant's exhibits 18c (Thomas Pitts); 19b (Albert Pitts); 19j (James Pitts). ATR set the formula by which the price was established and accepted each distributorship agreement at the price as fixed.

### 2. The Correct Valuation of the Distributorships

■ The statute makes a distinction between the "correct valuation" and the value stated by or on behalf of the seller.

the type of working capital tax shelter involved in this case.

The "correct valuation" is the fair market value—the amount payable in a bona fide commercial transaction between a willing buyer and a willing seller, neither being compelled to buy or sell and both having knowledge of relevant facts. *Music Masters*, 621 F.Supp. at 1055. As discussed in the legislative history:

> The penalty for gross valuation overstatement will have no effect on bona fide commercial or investment transactions in which, for example, a willing and knowledgeable buyer purchased from a willing and knowledgeable seller for cash because such a purchase price will define the value of the investment.

S.Rep. No. 494, 97th Cong., 2d Sess. 267, *reprinted in* 2 1982 U.S.Code Cong. and Admin.News 1015.

Ascertaining a "correct valuation" for ATR's territorial distributorships may be difficult to do, but even at the top of the realistic range, the stated value is many times greater than the "correct valuation."

### 3. Direct Relation of the Value Stated to a Deduction

■ Plaintiffs argue that since the notes for the "Incurred Annual Contingent Amounts" are with recourse, they must be paid from distributorship profits or by the investors themselves, giving economic substance to the transaction. Also, the allowable deduction is computed from the amount of debt, not the fair market value of the distributorships. Therefore, according to plaintiffs, the deduction is related to the debt incurred and does not involve a "statement of value."

This contention misses the relevant point. The amount of debt incurred is itself a statement of value, being the purchase price upon which the deductions are based. The amount of the debt, recourse or not, exceeds by more than 200 percent the correct value of the distributorships.

Also, the recourse debt appears to lack bona fides. Albert Pitts and Anthony Tedeschi, a territorial distributor, testified

that they expected such payments to be made, but the nature of the transactions and the material used to market the distributorships strongly suggest otherwise.[7]

## IV.

The following conclusions are made:

1. Plaintiffs organized and participated in the sale of a plan and furnished gross valuation overstatements that were directly related to the amount of an allowable deduction.

2. In so doing, plaintiffs violated 26 U.S.C. § 6700.

3. The government has proved each element of the violations by a preponderance.

4. Plaintiffs are liable for the penalties assessed, which they agreed were properly computed.

It is so ordered.

### ENTRY OF JUDGMENT

AND NOW, this 3rd day of April, 1989 judgments are hereby entered in favor of defendant United States of America and against plaintiffs American Technology Resources, Albert S. Pitts, James A. Pitts and Thomas M. Pitts as follows, for the reasons set forth in Memorandum of Decision Under Fed.R.Civ.P. 52(a):

1. The provisions of 26 U.S.C. § 6700 are applicable to each plaintiff for selling abusive tax shelters as to the tax years 1982 and 1983;

2. Plaintiffs are liable to defendant United States of America (Internal Revenue Service) under 26 U.S.C. § 6700 for the following penalties:

| | | |
|---|---|---|
| —American Technology Resources | 1982— | $ 78,400 |
| | 1983— | 116,025 |
| | | $194,425 |
| —Albert S. Pitts | | 6,000 |
| —James A. Pitts | | 4,000 |
| —Thomas M. Pitts | | 8,000 |

Costs on plaintiffs.

---

**7.** Although not explained, it appears that the purpose of having the "at risk" debt payable to a nonprofit corporation was to attempt to avoid the tax effects of having it accrued as income to

ATR. The device of an interest-free loan from USMPI insulated ATR, a for-profit corporation, from having to declare the accrued obligations of the investors as accrual income.