JOAN PROPST MAULTSBY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Maultsby v. Commissioner
Docket No. 36109-85
United States Tax Court
T.C. Memo 1989-659; 1989 Tax Ct. Memo LEXIS 659; 58 T.C.M. (CCH) 960; T.C.M. (RIA) 89659; December 18, 1989
Joan Propst Maultsby, pro se. Frank C. McClanahan, III, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: This case was assigned to Special Trial Judge Stanley J. Goldberg pursuant to section 7443A(b)(4) of the Internal Revenue Code of 1986 and Rule 180 et seq. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GOLDBERG, Special Trial Judge: Respondent determined deficiencies in and additions to petitioner's Federal income taxes for the years and in the amounts as follows: *661 Addition to Tax
Year
Deficiency
§ 6659(a)
1979
$ 11,794
$ 1,943
1980
$  4,582
$ 1,375
1981
$  4,040
-0-
1982
$    437
-0-
Respondent further determined that for all years petitioner is liable for additions to tax under section 6621(c), formerly 6621(d). [2]
For the most part, the deficiencies are attributable to the disallowance of investment tax credits, investment tax credit carrybacks, lease payments, and distributor fees claimed by petitioner in connection with her investments in two separate master recording leasing programs. In this opinion, however, we will discuss the issues which relate exclusively to petitioner's investment in the Music Masters, Ltd. Master Sound Recording Lease Program. More specifically, we will focus on the investment tax credit and deductions petitioner claimed in 1982 in connection with this investment. We also will address the investment tax credit carrybacks claimed in 1979, 1980, and 1981, to the extent these credits were claimed in connection with *662 Music Masters. The issues relating to petitioner's investment in another master recording leasing program (Mid South Music) are reserved for a future opinion. After concessions by petitioner, the issues remaining for decision are: (1) whether petitioner is entitled to deductions and credits claimed with respect to her investment in the Music Masters, Ltd. Master Sound Recording Lease Program; and (2) whether petitioner is liable for the additions to tax determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner resided in Charlotte, North Carolina when she filed her petition. Background
In March 1982, Alfred Masters and John Olive formed Music Masters, Ltd. (Music Masters). Music Masters was formed for the purpose of purchasing master recordings (masters) and leasing the masters to investors. Investors were to contract with distributors who would manufacture and market recordings produced from the masters. During 1982 and 1983, Music Masters purchased approximately 135 Masters from Gold Shield Productions, Inc. and from Hice Music *663 Corporation (Hice). Music Masters agreed to pay $ 1,000,000 for each single LP master and $ 2,000,000 for each double LP master. On December 17, 1982, Music Masters purchased from Hice a double LP master of recording artists called The Embers. Music Masters purchased this master with a cash downpayment of $ 20,000 and a purported recourse promissory note for $ 1,980,000, with interest accruing at 9 percent per year. Under the terms of the note, no payment of principal or interest was due for 12 years, except from one-third of the profits Music Masters received through sales of records and tapes produced from the master. The Promotion
Music Masters began promoting the "Master Sound Recording Lease Program" (leasing program) in 1982, by preparing promotional material and distributing it at seminars and other meetings of potential investors. The promotional brochure claims the leasing program is "based primarily on profit potential." However, the obvious focus of the brochure is on the tax benefits of the program. Indeed, the brochure is filled with terminology from the Internal Revenue Code, including citations to various sections of the Code and to the regulations. The *664 alleged availability of an investment tax credit was featured prominently in the brochure as a benefit of investing in the program. The brochure also informed the investor that lease payments and distribution costs were deductible as business expenses on Schedule C. Potential investors had access to several tax opinions which had been prepared for Music Masters by a C.P.A. and by a tax attorney. The tax attorney also was "available" to answer questions investors had about the leasing program. The tax opinions, which are based on information provided by Music Masters, discuss the investment tax credit at length. Investors were urged to seek their own counsel before entering the leasing program. The leasing program was devised such that each master owned by Music Masters was divided into 25 units. Each unit represented a 4 percent leasehold interest in a master. Units were leased to investors/lessees for a term of 90 months (7-1/2 years). Music Masters offered lessees different leasing plans which employed different marketing techniques. The "TV/RADIO" plan used television and radio advertisements for direct response sales of double LP albums through a toll-free telephone *665 number. In the "REGULAR" plan, single LP albums were distributed for sales through record shops and variety stores. The lessee was to select a leasing plan when she executed her lease. Upon executing a lease, the lessee entered into a separate "Manufacturing and Distribution Agreement" with a distributor. In this case the distributor was Galaxy, Ltd. (Galaxy), whose president was the son of Music Masters officer John Olive. The distributor charged the lessee a fee to manufacture and market recordings produced from the master. The amount of the distribution fee was dependent upon the number of units leased and on the leasing plan selected by the lessee. The promotional brochure, the lease agreement, and the distribution agreement require the lessee to exploit the master independently of the distributor. Appraisals
Music Masters ordered appraisals to support the price it had paid for The Embers master. The purchase price of the master was provided to the appraisers and this price formed the basis for the appraisers' determination of "fair market value." See United States v. Music Masters, Ltd., 621 F. Supp. 1046 (W.D.N.C. 1985), affd. without opinion 816 F.2d 674 (4th Cir. 1987). *666 All appraisals of The Embers master suggested that the master had a value of $ 2,000,000. The Embers double LP master has a fair market value of $ 10,000. Petitioner's Transactions
Petitioner learned of the Music Masters leasing program through her friend Alfred Masters. She had known Mr. Masters through his affiliation with the Mid South Music master leasing program, in which petitioner was an investor. Mr. Masters also assisted petitioner in the preparation of her tax returns. Petitioner did not earn any income through her investment in Mid South. Petitioner attended a seminar at which representatives of Music Masters promoted the leasing program. At this meeting, petitioner received the promotional material and was given the opportunity to ask questions. Before investing in Music Masters, petitioner did not listen to the master she intended to lease. She did not seek independent appraisals for her master, and she did not obtain expert advice on the economic viability of leasing masters. Petitioner holds a masters degree in education counseling and was employed as executive director of the National Conference of Christians and Jews. Petitioner chose to lease a four-percent *667 interest in the master of recording artists The Embers. On December 30, 1982, petitioner signed a lease agreement with Music Masters. The lease agreement conveyed to petitioner the right to commercially exploit the master in the United States only for a period of 7-1/2 years. A form entitled "Acknowledgement of Lessee" attached to the lease agreement indicates that petitioner made her lease payment of $ 3,600 in cash. The form also sets forth an investment tax credit in the amount of $ 8,000 which represented the proportional share of the credit to which petitioner was allegedly entitled. An "Election To Pass Investment Tax Credit From Lessor To Lessee" also was attached to the lease agreement. Petitioner did not negotiate any of the terms contained in her lease. In addition to the lease agreement, petitioner also executed a "Manufacturing and Distribution Agreement" with Galaxy. In this document, Galaxy agreed to manufacture recordings of the Embers and to "augment the individual sales efforts of [petitioner]." In exchange, petitioner agreed to pay a fee. The fee for petitioner, who leased one unit in the TV/radio program, was $ 800. The manufacturing/distribution agreement *668 also provided for the following apportionment of net receipts: 25% -- lessee 45% -- lessor 30% -- manufacturer/distributor Petitioner did not negotiate the terms of the manufacturing/distribution agreement, nor did she consider contracting with distributors other than Galaxy. On Schedule C attached to her 1982 Federal income tax return, petitioner deducted the rental payment she made to Music Masters for the lease of her master, and she deducted the distributor fee she paid to Galaxy. Petitioner also claimed an investment tax credit in 1982 and investment tax credit carrybacks to prior years. The claimed investment credit and carrybacks were based on the purchase price of $ 2,000,000 that Music Masters paid for The Embers master. Petitioner received approximately $ 150 of income from sales of recordings produced from her leased master. She also received a commission of $ 1,260 from the "sale" of the interest in The Embers master to herself. Petitioner's commission had been arranged through her friend, Mr. Masters. Program Operation
Petitioner received quarterly reports from Galaxy, her distributor. The reports for the first few quarters of 1983 reveal an *669 apparent optimism on the part of the distributor. By the end of the third quarter of 1984, however, Galaxy was reporting unprofitable sales efforts. On November 16, 1984, Galaxy terminated its distribution agreement with petitioner because it determined that "further efforts * * * [would] be ineffectual." Although petitioner was advised that the agreement had been terminated, she neither hired another distributor nor undertook to distribute the products herself. Petitioner failed to take these actions in spite of her awareness that she was obligated to distribute the recordings on her own. On November 12, 1985, Music Masters and its president, Alfred Masters, were enjoined from promoting and selling interests in the leasing program. United States v. Music Masters, Ltd., 621 F. Supp. 1046 (W.D.N.C. 1985), affd. without opinion 816 F.2d 674 (4th Cir. 1987). The District Court further ordered Music Masters to send a letter to petitioner (and other investors) offering to rescind the lease agreement petitioner entered into with Music Masters. Petitioner did not accept this offer of rescission. OPINION The first issue is whether petitioner is entitled *670 to an investment tax credit and to investment tax credit carrybacks, as well as deductions for the lease payment and distributor fee she made with respect to her investment in the leasing program. Petitioner bears the burden of proving that she is entitled to the claimed credits and deductions. Rule 142(a). A common threshold for the claimed credits and deductions is the taxpayer must be engaged in an activity for profit. Sec. 183. Soriano v. Commissioner, 90 T.C. 44 (1988). Whether an activity is engaged in for profit depends on whether the activity was undertaken with the objective of making a profit. Jasionowski v. Commissioner, 66 T.C. 312, 319 (1976). Although petitioner need not have a reasonable expectation of making a profit, she must have entered into the activity with an actual and honest profit objective. Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In this context, "profit" means economic profit, independent of tax savings. Seaman v. Commissioner, 84 T.C. 564, 588 (1985); Surloff v. Commissioner, 81 T.C. 210, 233 (1983). *671 In Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989), we adopted an objective test under which transactions involving "generic tax shelters" are disregarded if they are devoid of economic substance. In the case of a generic tax shelter, "the presence or absence of a profit objective is to be determined from the examination of certain objective factors which tend to indicate whether or not the disputed transaction had economic substance." Horn v. Commissioner, 90 T.C. 908, 933 (1988); Rose v. Commissioner, supra at 414. Under the Rose criteria, a "generic tax shelter" possesses some or all of the following characteristics: (1) the materials promoting the program focus on the tax benefits; (2) the investor accepted the agreement without negotiation of price or terms; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly before the transaction in question; *672 and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. Rose v. Commissioner, supra at 412. We find petitioner's lease of The Embers master possesses the characteristics of a generic tax shelter. The promotional material for the leasing program emphasizes the tax benefits of the leasing program. The brochure contains numerous references to the investment tax credit and to various sections of the Internal Revenue Code. Moreover, petitioner apparently was aware that she would receive an investment tax credit which would exceed her required cash investment. Petitioner accepted the price and the terms of her lease and manufacturing/distribution agreement without negotiation. Additionally, the master was overvalued; the rights to a master are difficult to value in the abstract, and the actual value of the tangible property involved was minimal. Finally, we note that although there was no indebtedness on the investor level, Music Masters deferred the bulk of the consideration (99 percent) which it agreed to pay for the master, with a note which was to be paid from one-third of the proceeds Music Masters was *673 slated to receive. Petitioner's activities with respect to The Embers master falls within the definition of a generic tax shelter. Therefore, we apply the unified approach of Rose to determine whether the transaction is devoid of economic substance. The Rose approach evaluates the following factors: (1) the investment activities of petitioner; (2) the relationship between price and fair market value; (3) the structure of the financing; and (4) perceived Congressional intent. 1. Petitioner's Investment Activities
Prior to leasing The Embers master, petitioner invested in another master recording leasing program. Although petitioner earned no income from her first investment in master leases, she invested in The Embers master through the Music Masters program. Petitioner did not independently investigate the economics of the leasing activity, nor did she contact someone knowledgeable to study the viability of the program. Furthermore, she did not listen to the master before leasing it. After the program began, petitioner undertook no independent distribution effort, despite her contractual obligations. Moreover, once Galaxy terminated the existing distribution *674 agreement, petitioner did not attempt to hire another distributor. 2. Relationship Between Fair Market Value and Price
The price of $ 2,000,000 for The Embers double LP master bears no relationship to the fair market value of the recording. The evidence of value provided by respondent's expert witness, Mr. Bonetti, was very convincing. The opinions of expert witnesses are admissible and relevant to the issue of value, but the opinions are weighed according to the experts' qualifications and other relevant evidence. See Johnson v. Commissioner, 85 T.C. 469, 477 (1985). This Court may reject expert testimony if it is judged appropriate to do so. Helvering v. National Grocery Co., 304 U.S. 282 (1938); Chiu v. Commissioner, 84 T.C. 722 (1985). As previously stated, respondent's expert witness, Thomas Bonetti, testified and submitted an appraisal of The Embers master. Mr. Bonetti evaluated the master using a potential stream of income approach. He listened to a recording produced from the master, and analyzed the quality of the production and packaging. He also researched the artists, as well as the material performed, *675 and considered the cost effectiveness of delivering this particular recording to the consumer. Mr. Bonetti determined that The Embers double LP master had a value of $ 10,000, noting the master was reasonably well-produced and the group had a strong local following in North Carolina and Virginia. He stated, however, that the recording lacked sophisticated production techniques and the packaging was unsuitable for retail sales. Mr. Bonetti was thorough and professional. His appraisal was performed with care, and we accept the value of $ 10,000 as determined in the appraisal as the fair market value of The Embers masters and have found $ 10,000 to be the value in our findings of fact. Consequently, we find that the fair market value of the master bears no relationship to the value petitioner claimed for her investment tax credit. 3. Structure of the Financing
A sale financed by deferred debt which in substance or in fact is not likely to be paid, is an indicia of lack of economic substance. Rose v. Commissioner, supra at 419. Our analysis must focus on the substance rather than the form of the debt. Waddell v. Commissioner, 86 T.C. 848, 902 (1986), *676 affd. 841 F.2d 264 (9th Cir. 1988). In this case, Music Masters executed a promissory note in the amount of $ 1,980,000 to finance the purchase of the master from Hice. Although this note was stated to be a "full-recourse promissory note," no payment of principal or interest was due for 12 years, except from one-third of the profits Music Masters was to receive from the sale of recordings produced from the master. The amount of this promissory note was greatly inflated in relation to the value of the master. Because this note was so commercially unreasonable, we do not believe it was ever intended to be repaid. Rather, the note was used to inflate the value of the master to increase the amount of the investment tax credit. Although there was no indebtedness at the investor level, petitioner did benefit from the inflated valuation when Music Masters elected to pass through the investment tax credit to petitioner. The promissory note executed by Music Masters to Hice, therefore, was an integral part of the arrangement between Music Masters and petitioner and indicates lack of economic substance in this case. [3]
*677 4. Perceived Congressional Intent
We do not believe Congress intended to encourage investment in master recording leasing ventures like the one at issue. See Rose v. Commissioner, supra at 421-422. From our analysis of petitioner's investment activities, the disparity between the claimed value of the master and its actual fair market value, as well as the underlying financial structure of the leasing program, we find that petitioner's leasing activity was devoid of economic substance and should be disregarded for tax purposes. Therefore, petitioner is not entitled to deductions for the lease payment she made to Music Masters, she is not entitled to deductions for the distributor fee paid to Galaxy, and she is not entitled to the claimed investment tax credit and investment tax credit carrybacks. Section 6659 Addition to Tax
A graduated addition to tax is imposed on individuals whose underpayment of tax equals or exceeds $ 1,000 and is attributable to a valuation overstatement. Sec. 6659. A valuation overstatement exists if the value of any property claimed on any return is 150 percent or more of the amount determined to be the correct *678 amount of such valuation. Sec. 6659(c)(1). If the valuation claimed exceeds 250 percent of the correct valuation, then the addition to tax is equal to 30 percent of the underpayment, but only to the extent the underpayment is attributable to the valuation overstatement. Section 6659 does not apply to underpayments of tax which are not "attributable to" valuation overstatements. See Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). Petitioner based her investment tax credit and carrybacks on a claimed fair market value of $ 2,000,000 for the master she leased. This value was equal to the price purportedly paid by Music Masters to Hice for the master. The actual fair market value of the master bears no relationship to the value petitioner used in claiming her investment tax credit. We have found that the fair market value of The Embers master is $ 10,000. Thus, for 1979 and 1980 the section 6659 valuation overstatement addition to the tax applies, to the extent the carrybacks are related to the Music Masters investment. Section 6621(c) Addition to Tax
Section 6621(c)(1) imposes an increased rate of interest *679 when there is a "substantial underpayment attributable to tax motivated transactions." For purposes of section 6621(c), an underpayment exceeding $ 1,000 is substantial. Although respondent contends that petitioner is liable for the section 6621(c) addition to tax in 1982, we note that the underpayment of tax (deficiency) for that year is $ 437. By definition, therefore, the underpayment in 1982 is not substantial because it does not exceed $ 1,000. Sec. 6621(c)(2). With regard to the years 1979, 1980, and 1981, we are not able to determine the extent to which the underpayments of tax in those years are attributable to petitioner's investment in Music Masters, as opposed to her investment in Mid South. Respondent has not assisted the Court in making this calculation, and petitioner's investment in Mid South is not an issue which is currently before the Court. Therefore, if the underpayment in 1979, 1980, and 1981 exceeds $ 1,000, section 6621(c) will apply, and this will be resolved through Rule 155. To reflect the foregoing, An appropriate order will be issued. Footnotes
1. Hereinafter, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Section 6621(d) was amended and redesignated as section 6621(c) by the Tax Reform Act of 1986, sec. 1151(c)(1), Pub. L. 99-514, 100 Stat. 2744.↩
3. See Avers v. Commissioner, T.C. Memo. 1988-176; Apperson v. Commissioner, T.C. Memo. 1987-571↩, on appeal (7th Cir., Mar. 9, 1988).